In the Matter of the TOWN OF HENRIETTA et al., Petitioners, v DEPARTMENT OF ENVIRONMENTAL CONSERVATION OF THE STATE OF NEW YORK et al., Respondents. SOUTH TOWN PLAZA, INC., Intervenor-Respondent.

Fourth Department, July 10, 1980

APPEARANCES OF COUNSEL

*Harris, Beach, Wilcox, Rubin & Levey (J. Montieth Estes* of counsel), for Miracle Mile Associates, petitioner.

*Erwin N. Witt* for Town of Henrietta, petitioner.

*Robert Abrams, Attorney-General (Peter G. Crary, William J. Kogan* and *James A. Sevinsky* of counsel), for respondents.

*Richard Mayberry* for intervenor-respondent.

**OPINION OF THE COURT**

CALLAHAN, J.

In this CPLR article 78 proceeding, transferred to this court by order of Supreme Court, Monroe County, pursuant to CPLR 7804 (subd [g]), petitioners Miracle Mile Associates and the Town of Henrietta seek to vacate certain conditions imposed upon permits granted by respondent Department of Environmental Conservation.

Petitioner Miracle Mile Associates, developer of a regional shopping center to be known as "The Marketplace", received final site approval from the Town of Henrietta in 1974 on a 125-acre tract simultaneously rezoned commercial for this project.

In accordance with an agreement with the developers, the County of Monroe has constructed a new Clay Road, which forms the eastern boundary of the mall site. Various other

road improvements, including the construction of an interchange for the Genesee Expressway, have been authorized by the State and county, in part to facilitate traffic in and around the proposed mall. Also, the developers, with full knowledge and acquiescence of the United States Army Corps of Engineers and county and town officials, relocated Red Creek to the southerly boundary of the property in order to accommodate the mall and mitigate the loss of the old creek.

In June, 1978, the Commissioner of Environmental Conservation noted that it was still practicable to modify the proposed project in such a way as to mitigate adverse environmental impacts within the purview of the State Environmental Quality Review Act (ECL 8-0101 *et seq.,* hereinafter SEQRA). He invoked his authority pursuant to that act to require the preparation of an environmental impact statement (hereinafter EIS) for this project (ECL 8-0111, subd 5, par [a]). The Department of Environmental Conservation (hereinafter DEC) was designated as lead agency for the purpose of carrying out the environmental impact review of the project, which designation placed upon DEC the responsibility of preparing an adequate final EIS (ECL 8-0111, subd 6; 6 NYCRR 617.8 [e]).

Petitioner Miracle Mile Associates submitted to DEC a joint application for a freshwater wetlands permit (ECL art 24; 6 NYCRR Part 662) and for a water quality certification, pursuant to section 401 of the Federal Clean Water Act (US Code, tit 33, § 1341) and 6 NYCRR Part 608.[1] Also submitted was an application for an indirect source air quality permit for parking facilities, as then required by ECL article 19 and Part 203 (6 NYCRR Part 203) of the DEC regulations. On June 12, 1979, the Town Board of the Town of Henrietta submitted, on behalf of Henrietta Water District No. 1, an application for approval of engineering plans for the extension of the district's water supply and distribution mains to service the proposed shopping center.

On May 10, 1979, Miracle Mile Associates submitted to DEC an amended draft environmental impact statement (hereinaf-

---

1. Pursuant to section 404 of the Federal Clean Water Act (US Code, tit 33, § 1344), the placing of fill in a wetland requires a permit from the United States Army Corps of Engineers. Under section 401 of the act, a condition precedent to such a permit is a certification from DEC that this action will not contravene specified water quality standards. In considering applications for such certifications, DEC applies the standards contained in 6 NYCRR 608.6.

ter DEIS) which contained a discussion and analysis of the project's total environmental setting, cumulative environmental and socioeconomic impacts expected to result from the project, and various mitigating measures proposed by petitioner to minimize adverse environmental effects. The proposed mitigation measures included ecosystem and wetland considerations, drainage and flooding abatement measures, and air pollution and noise pollution abatement measures, as well as abatement measures to mitigate aesthetic impacts, traffic impacts, and interference with communtiy activities.

A public hearing to consider petitioners' permit applications was commenced by DEC on August 2, 1979 to fulfill both its procedural and substantive obligations under SEQRA (ECL art 8). During the course of the hearing, the DEC regulations were amended to eliminate parking facilities, including lots and garages, from the definition of an indirect source of air contamination (6 NYCRR 203.2, amd eff Aug. 11, 1979), thereby eliminating the necessity for an indirect source permit. Subsequent to the hearing, this court determined that as a result of the town's prior site plan approval, the project was not subject to the requirements of the Freshwater Wetlands Act *(Matter of Miracle Mile Assoc. v Department of Environmental Conservation of State of N. Y.,* 73 AD2d 807). Accordingly, during the course of the hearing, only two applications were properly before the DEC for consideration. It was determined that the evidence accumulated during the integrated EIS/permit hearing could not be reasonably differentiated into categories exclusively permit-related or exclusively EIS-related. The hearing report, therefore, was submitted as the final EIS and decision on the specific permit applications (ECL art 8; 6 NYCRR Part 617). It concluded that the petitioners' actions as proposed would not contravene the standard set by DEC concerning water supply (6 NYCRR 601.25) or water quality certification (6 NYCRR 608.6). However, the report/EIS also contained several conclusions concerning various other aspects of the project's cumulative environmental impact. DEC adopted the findings, conclusions and recommendations of the Administrative Law Judge and granted the permits subject to 18 conditions therein set forth. It is these conclusions which frame the basis for the permit conditions challenged by the petitioners.

According to DEC the majority of these conditions were intended to assure that petitioners, in carrying out their

proposals, actually comply with the specific standards set for their respective permits. The remaining conditions were intended to fulfill DEC's obligation under SEQRA as an approving agency to insure that all of the project's adverse environmental effects revealed in the EIS are minimized or avoided (ECL 8-0109, subds 1, 8; 6 NYCRR 617.9 [c]). As stated in the report, "[t]he purpose of the above recommended conditions is not to infringe upon the authority of any other level of government, but rather to fulfill the Department's responsibility under the ECL to insure that the proposal is carried out in the least environmentally-damaging manner."

Petitioners seek in this proceeding to annul the conditions imposed upon the approvals granted by the DEC, contending that SEQRA does not authorize DEC to attach conditions to a permit or approval where such conditions have no relevance to the permit or approval sought. Although the attack in their petition was addressed to all 18 conditions, petitioners in their brief expressly limit their challenges to conditions 4(c), 8, 10, 11, 12, 17 and 18.[2]

The purpose of the New York State Legislature in the enactment of SEQRA (ECL 8-0101 *et seq.;* L 1975, ch 612) was

---

2. "4. Detailed construction plans shall be submitted to the Department for review and approval prior to beginning construction on each of the following aspects of work: * * *

"(c) all landscaping, particularly with respect to the outer boundaries of the Site * * *

"8. To insure maximum wildlife utilization of detention/retention basins, dense vegetative screens of low-lying conifers and shrub species, such as autumn olive and dogwood, shall be planted along the basin perimeters * * *

"10. The area identified on Appendix 'A' as 'Future Development Area A' Between Ponds 'A' and 'B,' at the southeasterly boundary of the Site, shall be maintained in an undeveloped condition for the life of the mall project.

"11. The water line that would extend from the looped system of distribution mains that is proposed as part of the overall water supply system for The Marketplace to the 'Future Development Area' in the southeast portion of the Site for the purpose of serving that area in the future shall be eliminated from the water supply plans, and shall not be installed as part of the development of the 125-acre Site.

"12. Parking areas for the completed project shall not exceed a total of 5,515 spaces * * *

"17. An energy conservation plan pursuant to Energy Law shall be submitted to the Town and the Department concurrently upon the completion of preliminary design plans for the project or the submission of applications for building permits, whichever is earlier.

"18. Prior to operation of the mall, the Applicant shall submit to the Department for approval a plan to monitor carbon monoxide at the Site and a proposal for remedial action in the event of violation of applicable air standards."

"to declare a state policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources; and to enrich the understanding of the ecological systems, natural, human and community resources important to the people of the state." (ECL 8-0101.) This court has recognized the legitimate purpose of this legislation and its intent that all regulatory agencies "conduct their affairs with an awareness that they are stewards of the air, water, land, and living resources, and that they have an obligation to protect the environment for the use and enjoyment of this and all future generations." (ECL 8-0103, subd 8; 8-0109, subd 1; *H.O.M.E.S. v New York State Urban Dev. Corp.,* 69 AD2d 222, 229.) These avowed purposes are achieved by the imposition of both procedural and substantive requirements upon agency decision making.

Procedurally, SEQRA requires the preparation of an environmental impact statement (EIS) for any action which may have a significant effect on the environment (ECL 8-0109, subd 2). An EIS is intended to provide detailed information about the effect which the proposed action is likely to have on the environment, to list ways in which any adverse effects of such an action might be minimized, and to suggest alternatives to such an action so as to form the basis for a decision whether or not to undertake or approve such action. The EIS, the heart of SEQRA, clearly is meant to be more than a simple disclosure statement as petitioners would construe it. Rather, it is to be viewed as an environmental "alarm bell" whose purpose is to alert responsible public officials to environmental changes before they have reached ecological points of no return (see *Natural Resources Defense Council v Arcata Nat. Corp.,* 59 Cal App 3d 959, 966). Federal courts have recognized the significant role of an EIS under the National Environmental Policy Act of 1969 (US Code, tit 42, § 4321 *et seq.,* hereinafter NEPA), the Federal environmental statute upon which the New York act was modeled (see *Calvert Cliffs' Coordinating Committee v Atomic Energy Comm.,* 449 F2d 1109, 1114; *Iowa Citizens for Environmental Quality v Volpe,* 487 F2d 849, 851). Moreover, Federal courts have clearly enunciated that NEPA is more than just a mere disclosure statute (as petitioners would characterize SEQRA). Rather, NEPA requires full consideration by Federal decision makers of the environmental

consequences and project alternatives indicated in the EIS. *(Calvert Cliffs' Coordinating Committee v Atomic Energy Comm.,* 449 F2d 1109, *supra; Zabel v Tabb,* 430 F2d 199, cert den 401 US 910; *Natural Resources Defense Council v Morton,* 458 F2d 827, 834-835; *Environmental Defense Fund v Mathews,* 410 F Supp 336.) This clearly means that NEPA requires Federal agencies to take into account all environmental consequences of their projects before they decide to undertake them, regardless of whether or not the specific environmental concern was previously within their mandate, as well as all possible and feasible mitigation measures. *(Environmental Defense Fund v Mathews, supra,* pp 337-338; *Calvert Cliffs' Coordinating Committee v Atomic Energy Comm., supra,* p 1112; *Zabel v Tabb, supra,* p 213; *Municipal Intervenors Group v Federal Power Comm.,* 473 F2d 84, 89-90, n 4; *State of Alaska v Andrus,* 580 F2d 465, vacated in part on other grounds *sub nom. Western Oil & Gas Assn. v Alaska,* 439 US 922; *Environmental Defense Fund v Froehlke,* 473 F2d 346, 351-352; *Sierra Club v Froehlke,* 359 F Supp 1289, 1339-1340, mod *sub nom. Sierra Club v Callaway,* 499 F2d 982.) The States of Washington and California with analogous statutes have similarly construed their environmental statutes (see *State of Washington v Lake Lawrence Public Lands Protection Assn.,* 92 Wn 2d 656; *Polygon Corp. v City of Seattle,* 90 Wn 2d 59; *City of Walnut Creek v County of Contra Costa,* 101 Cal App 3d 1012; *City of Carmel-by-the-Sea v Board of Supervisors of Monterey County,* 71 Cal App 3d 84; *Coastal Southwest Dev. Corp. v California Coastal Zone Conservation Comm.,* 55 Cal App 3d 525).

A reasonable interpretation of the New York statute indicates that the Legislature intended an EIS under SEQRA to have a similar broad scope. SEQRA requires an EIS to set forth "any adverse environmental effects which cannot be avoided should the proposal be implemented" (ECL 8-0109, subd 2, par [c]) and defines "[e]nvironment" very broadly to include, *inter alia,* "land, air, water, minerals, flora, fauna, [and] noise" (ECL 8-0105, subd 6). The statute cannot be construed as merely procedural or informational since it states that all approving agencies involved in an action must actually consider the EIS and formulate a decision on the basis of all the adverse environmental impacts disclosed therein (ECL 8-0109, subd 2). Since SEQRA requires an approving agency to act affirmatively upon the adverse environ-

mental impacts revealed in an EIS (ECL 8-0109, subds 1, 8), an EIS filed pursuant to SEQRA must also be recognized as not a mere disclosure statement but rather as an aid in an agency's decision making process to evaluate and balance the competing factors.

Furthermore, SEQRA's legislative history supports a broad construction of its provisions. The Governor's memorandum in support of SEQRA emphasized the extensive mandate of SEQRA "to require the filing of an environmental impact statement in regard to all projects or activities undertaken or approved by any state agency, local agency or unit of local government". (NY Legis Ann, 1975, p 438.) The information provided by the impact statement thus allows State and local officials intelligently to assess and weigh the environmental factors, along with social, economic and other relevant considerations in determining whether or not a project or activity should be approved or undertaken in the best over-all interest of the people of the State (NY Legis Ann, 1975, pp 438-439). SEQRA therefore requires a decision maker to balance the benefits of a proposed project against its unavoidable environmental risks in determining whether to approve the project. While an EIS does not require a public agency to act in any particular manner, it constitutes evidence which must be considered by the public agency along with other evidence which may be presented to such agency (*Carmel Val. View v Board of Supervisors of Monterey County,* 58 Cal App 3d 817, 822). Thus the general substantive policy of the act is a flexible one. It leaves room for a responsible exercise of discretion and does not require particular substantive results in particular problematic instances. It does, however, make environmental protection a part of the mandate of every State agency and department.

Although not raised by the DEC on this appeal, we note that in addition to enacting the aforesaid provisions of SEQRA, the Legislature amended ECL 3-0301 (subd 1, par b) in 1975 to authorize the Commissioner of Environmental Conservation, when making any determination in connection with any license, order, permit, certification or other similar action to take into account the cumulative impact of the proposal on water, land, fish, wildlife and air resources. This separate grant of authority would also support the DEC's attachment of conditions to permits that it approves, so long

as the conditions are reasonably related to the cumulative purposes of the ECL.

We must be ever cognizant that environmental amenities will often be in conflict with economic and technical considerations. To consider the former along with the latter must involve a balancing process. In some instances, environmental costs may well outweigh economic and technical benefits while in other instances they may not; but SEQRA mandates a rather finely tuned and systematic balancing analysis in every instance (see *Calvert Cliffs' Coordinating Committee v Atomic Energy Comm.*, 449 F2d 1109, 1114, *supra).* The Legislature, in declaring that "the policies, statutes, regulations, and ordinances of the state and its political subdivisions should be interpreted and administered in accordance with the policies set forth in this article" explicitly qualified these duties by the introductory phrase "to the fullest extent possible" (ECL 8-0103, subd 6). This language does not make the act's procedural requirements somehow "discretionary". Indeed, the requirement of environmental consideration "to the fullest extent possible" sets a high standard which must be enforced by the reviewing courts (cf. *Calvert Cliffs' Coordinating Committee v Atomic Energy Comm, supra,* p 1114). Failure to employ this balancing analysis may be grounds for nullifying an administrative decision (cf. *City of Carmel-by-the-Sea v Board of Supervisors of Monterey County,* 71 Cal App 3d 84, *supra).* While decision makers must take environmental objectives into account, satisfactory answers to these objectives may be provided by reference to the EIS itself. Decision makers are not precluded from forecasting future needs; indeed, they are encouraged to make reasonable forecasts in the preparation of an EIS. Here the estimates were supported by substantial evidence.

In view of what we deem to be a clear legislative mandate that the EIS be given a broad construction, it follows that it applies to the entire project and is not limited to the specific pending permit applications. Moreover, the regulations enacted under SEQRA, pursuant to ECL 8-0113, support this broad reading of the statute (6 NYCRR 617.14 [a], 617.9 [c]). Thus, the regulations in accord with the statutory provisions of SEQRA, make clear that an agency in approving an action must make a written finding that it has imposed whatever conditions are necessary to minimize or avoid all adverse environmental impacts revealed in the EIS.

We caution, however, that SEQRA must be construed in the light of reason. Any limitations or conditions imposed accordingly must be governed by a "reasonableness test" if they are to survive judicial review (see *Sierra Club v Froehlke,* 359 F Supp 1289, 1340-1341, revd 499 F2d 982, *supra; Residents Ad Hoc Stadium Committee v Board of Trustees of Cal. State Univ. & Colls.,* 89 Cal App 3d 274, 287; *City of Walnut Creek v County of Contra Costa,* 101 Cal App 3d 1012, *supra).* The environmental statement to some extent must be examined in light of the particular facts and circumstances surrounding the project. The extent of detail required must necessarily be related to the complexity of the environmental problems created by the project (see *Iowa Citizens for Environmental Quality v Volpe,* 487 F2d 849, 852, *supra).*

Having found that DEC did have authority to attach the challenged conditions to the permits it issued petitioners, our duty then is to scrutinize the record and determine whether substantial evidence supports the administrative agency's findings and whether these findings support the agency's decision. In making these determinations, we must resolve reasonable doubts in favor of the administrative findings and decisions (see *Matter of City of Rome v New York State Health Dept.,* 65 AD2d 220, 225, mot for lv to app den 46 NY2d 713; *Matter of Richardson v Connelie,* 65 AD2d 654, 655).

As we view it, condition 10, leaving area A undeveloped, is pivotal in its scope and directly affects conditions 4(c), 8 and 11. It is intended to mitigate the development's impact on wildlife habitat. The EIS specifically concluded that the mall would result in a total elimination of wildlife species on the portion of the site proposed for development. Petitioners' draft EIS proposed to mitigate this adverse impact by leaving three undisturbed areas totaling 12 acres. However, two of the three areas were designated by Miracle Mile for "future development". The hearing report/EIS firmly concluded that such temporary measures did not adequately mitigate the mall's impact on wildlife habitat. Consequently, condition 10 requiring only one of three undisturbed areas designated by Miracle Mile for future development to remain undeveloped clearly has a rational basis in the record. Likewise does condition 11 prohibiting extension of a water line to service this portion of the site, as well as condition 4(c), requiring approval of perimeter landscaping, which was intended to insure maximum wildlife utilization of the mall site's undeveloped areas.

The effect of the proposed mall on energy conservation (condition 17) is a relevant concern under SEQRA. The statute itself explicitly states that an EIS must set forth "effects of the proposed action on the use and conservation of energy resources, where applicable and significant" (ECL 8-0109, subd 2, par [h]). Moreover, article 3 (§ 3-101, subd 2) of the Energy Law provides that the State's energy policy encourages the "conservation of energy in the construction and operation of new commercial * * * buildings". By imposing condition 17, the DEC has not improperly interjected itself into the exclusive domain of the State Energy Commissioner, relative to the State Energy Conservation Construction Code (9 NYCRR Part 7810) as petitioners claim. Condition 17 does not attempt to enforce that code. Rather, it represents an attempt by the DEC to fulfill its obligations under SEQRA to analyze the project's effect on "the use and conservation of energy resources, where applicable and significant" (ECL 8-0109, subd 2, par [h]) and to insure that Miracle Mile fulfills the objectives of the State's energy policy.

Condition 12 allows the exact number of parking spaces envisioned by the petitioners for the project in its own DEIS. Additionally, the number of parking spaces at the mall is integrally related to site-generated traffic volume, which is, in turn, directly related to air quality, definitely a valid concern for DEC under SEQRA (ECL 8-0105, subd 6).

Condition 18 requires the developers to submit to DEC for approval a plan to monitor carbon monoxide at the site. Air quality is recognized as a valid concern of SEQRA and any adverse impact on air quality caused by the mall site should be identified and mitigated if possible. The difficulty, as we see it, with condition 18 arises in DEC's requiring and relying upon any sort of air quality analysis regarding highway traffic around the mall and then imposing the condition of air monitoring on the applicant for any alleged inadequacy in such a study. The record discloses that there are too many unquantifiable variables present, making it unreasonable to determine how much traffic near the mall is generated solely on account of the mall. Any air monitoring system imposed by the DEC would suffer from the same inadequacies. Condition 18, therefore, should be stricken as arbitrary and unreasonable.

This court granted intervenor-respondent South Town Plaza, Inc.'s application to intervene in this proceeding. We

reject, however, intervenor's contention that failure to join certain individuals or groups, in addition to DEC, who were actively involved in the August, 1979 administrative hearing requires dismissal for failure to join "necessary parties" pursuant to subdivision 7 of section 102 of the State Administrative Procedure Act and the joinder provisions of CPLR 1001, 1002 and 1003, which are applicable to CPLR article 78 proceedings. Participation by these third parties would not be necessary or required to elucidate the issue in this case; i.e., whether the DEC had the authority, pursuant to the provisions of the ECL, to attach certain conditions to permits it approved, or whether it acted in excess of its jurisdiction. Analogous Federal joinder provisions (viz., Fed Rules Civ Pro, rule 19 [in US Code, tit 28, Appendix]) reveal that intervenor's contentions, for the purpose of this case, are without merit (cf. *Natural Resources Defense Council v Tennessee Val. Auth.,* 340 F Supp 400, revd on other grounds 459 F2d 255).

Petitioners' reliance on the provision of SEQRA which provides that "[h]owever, the provisions of this article do not change the jurisdiction between or among state agencies and public corporations" (ECL 8-0103, subd 6) is not misplaced. A reading of subdivision 6 of section 8-0103 indicates that its purpose is to make clear that SEQRA is not intended to take away the jurisdiction or authority already granted to State agencies and public corporations. SEQRA, thus, simply is an overlay, supplementing the existing authority already possessed by these agencies or public corporations when acting as approving agencies for the purposes of SEQRA. In other words, in addition to the concerns these agencies and units of government already consider as part of their legislative mandate, they must now take into account environmental matters when deciding whether or not to approve an action covered by SEQRA. However the contrary interpretation urged by petitioners (i.e., that the provision means SEQRA changes minimally, if at all, the way an approving agency reaches a decision) makes no sense in light of the clear mandate to approving agencies expressed in other parts of the statute.

Accordingly, we hold that SEQRA requires an approving agency to consider fully the environmental consequences revealed in an EIS and to take these consequences into account when reaching a decision whether or not to approve an action. Moreover, the statute authorizes the approving agency to implement measures designed to mitigate the adverse environ-

mental impacts identified, so long as these measures are reasonable in scope and are reasonably related to the adverse impacts identified in the EIS.

Finally, we note that we have examined the other arguments raised by petitioners and find them to be without merit.

CARDAMONE, J. P., SIMONS, DOERR and MOULE, JJ., concur.

Petition unanimously granted to the extent that condition No. 18 be stricken and otherwise petition denied, without costs. Intervenor South Town's motion denied.