OPINION OF THE COURT
John R. Tenney, J.
Plaintiffs have brought this action to permanently enjoin the defendants from converting a substantial portion of the Marcy Psychiatric Center, a mental health facility, into a medium security prison under the Department of Correctional Services (DOCS). There are various plaintiffs including the board of visitors in its official capacity, its members in their individual capacities and a parent and other relatives of patients. Since the board of visitors as a body lacks the capacity to sue in this action (Matter of Pooler v Public Serv. Comm., 58 AD2d 940, affd 43 NY2d 750) its members will be treated as interested citizens who might be affected by the conversion.
*280 Although plaintiffs request an injunction, their pleadings question the authority and jurisdiction of the defendants. Therefore, the court will exercise discretion under CPLR 103 and convert this to a proceeding under article 78. (Santiago v Blum, 75 AD2d 596, 597.) Also, the issues raised involve questions of law under CPLR 7803 (subds 2, 3), thus, it may be determined by Special Term. (CPLR 7804, subd [g].)
The conversion is scheduled in two phases. Phase I is to be implemented in fiscal 1983-1984. DOCS proposes to convert at least five buildings now utilized to benefit and house mental patients to provide for 300 inmates. Other buildings on the Marcy campus will be renovated to receive the mental patients displaced by this process. There is no plan to decrease the Marcy population during this phase.
Phase II is scheduled for fiscal 1985-1986, at which time 900 additional DOCS inmates will be placed at Marcy. At completion of this phase only 2 of the more than 30 buildings will remain available for mental patients under the jurisdiction of the Department of Mental Hygiene. Most of the patients will be transferred to other mental health facilities in the State.
Plaintiffs’ arguments are addressed to alleged violations of portions of the Mental Hygiene Law and the Environmental Conservation Law. Section 7.11 of the Mental Hygiene Law outlines the general organization and administration of the Office of Mental Health. It states, in part:
“(a) The commissioner shall have the professional jurisdiction, supervision, and control of the office and all department facilities for the mentally ill.
“(b) The commissioner shall control the organization of the office and may continue, establish, discontinue, expand, and contract facilities under his jurisdiction. The facilities set forth in section 7.17 may not be discontinued by the commissioner.”
Marcy Psychiatric Center is one of the designated facilities under section 7.17 of the Mental Hygiene Law.
Defendants argue there is no violation of section 7.11 since the facility will not be discontinued. They argue that *281 the commissioner is legally exercising his authority to “contract” the center. They also contend that all that is proposed is to make joint use of the facility, called “co-location”, which exists elsewhere in the State with legislative approval. (Reference is to St. Lawrence Psychiatric Center and Ogdensburg Correctional Facility; Gowanda Psychiatric Center and Collins Correctional Facility; Pilgrim Psychiatric Center and Long Island Correctional Facility; and Craig Developmental Center and Groveland Correctional Facility. Defendants also state that “co-location” has existed for many years at Marcy because the Central New York Psychiatric Center is located there. However, this is not a correctional facility and does not constitute a “co-location”.)
A review of subdivision 6 of section 1.03 of the Mental Hygiene Law suggests that defendants have disregarded the definition of “facility” as it appears in section 7.11 where it is described as “any place in which services for the mentally disabled are provided and includes but is not limited to a psychiatric center, developmental center, institute, clinic, ward, institution, or building” (emphasis supplied). Even under Phase I, services of five buildings will be discontinued. In addition, athletic facilities including a golf course will be abandoned or impeded in use. Furthermore, the campus itself will be substantially disrupted by the change in mission and the necessary adjustments. The final Phase II will virtually eliminate the psychiatric center. The entire complex, with the exception of two buildings, will be discontinued in use from its present function. The conclusion is inevitable.
Defendants contend that since the budget, which included funds to make the conversion under Phase I, was approved by the Legislature (L 1983, chs 50, 54), they have acquired sufficient authority to complete Phase I. They contend that the remainder of the proposal is not properly before this court and that it would be premature to take into consideration future projections. The court disagrees.
Defendants agree that implementation of Phase II requires executive and legislative approval “through the budgetary process” at the very least. Commissioner Coughlin nevertheless concedes that “should there be any *282 ultimate conversion of all Marcy facilities to DOCS use, such conversion would, in light of Mental Health [sic] Law § 7.17 require legislative approval”. Although the Legislature may approve a general budget with specific line items, it does not concede the legality of the proposed expenditures nor does it relinquish any powers it has expressly reserved to itself. It would cripple the budgetary process if the Legislature were required to examine each item proposed by the executive to ascertain possible legal infringements on its authority. The Legislature must approve the budget under the valid assumption that the executive will comply with existing laws. The budget is a general statute which does not supersede specific statutory requirements. (Ball v State of New York, 41 NY2d 617, 623; Matter of Collins v City of Schenectady, 256 App Div 389, 391.)
The entire plan must now be considered. The near total conversion, which remains only a proposal during Phase I, will become a fait accompli by the time that Phase II comes before the Legislature. The legislators will be faced with an existing correctional institution, a substantial change in the campus atmosphere, an expenditure of millions of dollars and the argument presently made regarding the psychiatric center, “it is already done” and too costly to reverse. While in theory the project could at that time be reconsidered, this is not realistic. Indeed, the Court of Appeals has recognized the problems in submitting a proposal in piecemeal fashion, albeit in an environmental context as follows: “As a practical matter * * * the dynamics and freedom of decision-making with respect to a proposal to rescind a prior action are significantly more constrained than when the action is first under consideration for adoption. Thus, although not legally conclusive the initiatory action by the town board might well have been practically determinative.” (Matter of Tri-County Taxpayers Assn. v Town Bd. of Town of Queensbury, 55 NY2d 41, 46.)
Thus, the Commissioner of Mental Hygiene may not assent to and participate in the DOCS proposals without the express grant of authority from the Legislature required by sections 7.11 and 7.17 of the Mental Hygiene Law.
*283 The conclusion that a near total discontinuance of a mental hygiene facility may not be accomplished in a piecemeal fashion through annual budget requests is further supported by recent legislative amendments to the Mental Hygiene Law. For example, the current list of facilities in section 7.17 no longer includes five separate centers which, in 1979, were consolidated under the Manhattan Psychiatric Center and Pilgrim Psychiatric Center (L 1979, ch 48, §§ 1-5, eff April 1,1979). The fact that these consolidations required express legislative direction and specific amendment of section 7.17 indicates that the Legislature did not intend to authorize the commissioner to undertake major internal reorganizations without its direct intervention. The action proposed here is, if anything, more drastic than a mere internal reorganization. There is no indication from the Phase I budget action that a lesser measure of legislative direction under section 7.17 would be required.
Plaintiffs’ second contention is that defendants have either exceeded their authority or abused their discretion in going forward with their conversion plans without first complying with the provisions of the State Environmental Quality Review Act (ECL, art 8 [SEQRA]). Specifically, the defendants have not prepared and filed an environmental impact statement (EIS).
ECL 8-0109 expresses the legislative significance of the statute. It states, in part: “Agencies shall use all practicable means to realize the policies and goals set forth in this article, and shall act and choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable, minimize or avoid adverse environmental effects, including effects revealed in the environmental impact statement process.” (ECL 8-0109, subd 1.)
In furtherance of this legislative policy the regulations state that: “No agency involved in an action shall carry out, fund or approve the action until it has complied with the provision of SEQR. No agency shall issue a decision on an action that * * * may have a significant effect on the environment, until a final EIS has been filed.” (6 NYCRR 617.3 [a].)
*284 The courts have construed the statute and regulations broadly and have “read these provisions to mandate literal compliance with SEQRA; substantial compliance with the ‘spirit’ of the act does not constitute adherence to its policies ‘to the fullest extent possible’ {Matter of Rye Town/King Civic Assn, v Town of Rye, 82 AD2d 474, 480-481, apps dsmd 55 NY2d 747, mot for lv to app dsmd 56 NY2d 985.)
In its positive declaration issued pursuant to 6 NYCRR 617.10 (c) on May 9, 1983, DOCS stated that it had “determined that the proposed action — may have a significant effect on the environment and that a Draft Environmental Impact Statement (DEIS) will be prepared”. (See ECL 8-0109, subd 4.) In the usual case such a declaration would require DOCS to comply with the procedures for preparing, filing and finalizing an EIS prior to taking any action. The EIS acts as an “alarm bell” (Matter of Town of Henrietta v Department of Environmental Conservation of State of N. Y., 76 AD2d 215, 220) and it requires that possible consequences be studied “before they have reached ecological points of no return”. (Ibid.; see, also, Matter of Schenectady Chems. v Flacke, 83 AD2d 460, 463.) It also offers the effected public an opportunity to be heard.
Here, DOCS states that it is in the process of preparing a DEIS which should be filed by the end of May. Defendants nevertheless indicate that they may proceed without the DEIS under 6 NYCRR 617.2 (o) (6), which exempts emergency actions from the requirements of SEQRA. On May 9, 1983, defendants filed a declaration of emergency which in substance claims a crisis in the prison system. They cite Federal court action which requires that DOCS accept and house within 48 hours persons sentenced to a term in a State facility. (Benjamin v Malcolm, 75 Civ 3073.) They also cite the increase in the length of prison sentences under the 1978 violent felony law and a general “get tough” policy on criminals.
DOCS has demonstrated that there has been a substantial increase in the State-wide inmate population over the past three years and that more prison space must be made available. Defendants have not, however, demonstrated that this condition has created a need to .undertake actions *285 which “are immediately necessary on a limited emergency basis” (6 NYCRR 617.2 [o] [6]).
Although the term “limited emergency” has not as yet been construed in the reported decisions it, like other provisions of SEQRA, must be broadly construed in favor of the goals of SEQRA. (Matter of Town of Henrietta v Department of Environmental Conservation of State of N. Y., supra, at pp 222-223.) It would seem that two requirements must be fulfilled: the proposed action cannot be delayed without substantial and definite negative consequences to the project (“immediately necessary”); and the proposed action must be the minimum required to meet the emergency given the circumstances (“limited”). On the evidence before the court neither requirement has been fulfilled.
DOCS has not shown that it cannot delay implementation of Phase I pending completion of a final EIS. It has not even attempted to show what specific consequences might follow from failure to complete the project by the scheduled date. Rather, the commissioner states: “Since 1978 DOCS has examined and discussed a wide variety of alternative options for housing the growing prison population. DOCS has undertaken many and rejected others * * * It has only been in the last year and after all prior considerations have been ruled out, that the alternatives presented at Office of Mental Health and Office of Mental Retardation and Development Disabilities facilities have emerged as the most appropriate.”
While commendable, these efforts indicate an ongoing process, not an emergency. He then states: “In order to meet an originally scheduled May 15, 1983 deadline start-up date for initial implementation * * * at Marcy, on May 9, 1983 I issued an emergency declaration.”
There is no indication that immediate conditions required this determination. Rather, the declaration was issued after commencement of this action, because a start-up date suggested previously was drawing near.
Similarly, DOCS has not demonstrated that the immediate “limited” need for 300 inmate beds must be accomplished at Marcy. Instead, they have shown that the Marcy proposal is but a part of State-wide plan to ease the bed *286 shortage. No negative consequences are indicated to the over-all plan if Marcy is delayed.
There is no question that DOCS faces difficult tasks in the months and years ahead. After substantial intraagency study, the conclusion was reached that the “co-location” proposal was the most economical and efficient. But SEQRA requires more. The needs of DOCS must be “balanced” against other potentially conflicting interests. “Failure to employ this balancing analysis may be grounds for nullifying an administrative decision.” (Matter of Town of Henrietta v Department of Environmental Conservation of State of N. Y76 AD2d 215, 223, supra.)
Since no immediate, limited emergency has been demonstrated, the defendants are also in violation of the EIS requirements of SEQRA. Defendants may not proceed until proper compliance with all statutes has been demonstrated.