OPINION OF THE COURT
Michael F. Mullen, J.
This is a CPLR article 78 proceeding in which the petitioner, Rosalie Macchio, seeks to annul so much of a determi *623 nation of the respondent Planning Board of the Town of East Hampton, dated December 19, 1990 (which constituted a waiver of subdivision approval), as contained the following conditions: that the buildings and roofed structures on all the lots (four) could not exceed 22 feet or one story in height; and that all the buildings and roofed structures on three of the lots must have pitched roofs (minimum 1:2 rise over run), shall be sheathed only with natural wood shingle siding, and may be painted or stained only with muted natural colors, such as gray, brown, tan or black.
The petitioner contends, first, that the Planning Board was without authority to restrict the height of structures beyond the limits established in the town’s zoning ordinance and to require the use of specific building material or paints and stains; and second, if such authority exists, its exercise in this case was unreasonable and an abuse of discretion.
Briefly, the facts are as follows: the petitioner is the owner of approximately 6.776 acres of vacant land located on the east side of Flamingo Avenue, and the north side of Fenwick Place in the Hamlet of Montauk, Town of East Hampton. The land is located in an A-Residence zone, which requires minimum lots of 40,000 square feet. The petitioner applied for a waiver of subdivision approval pursuant to article XII of the Town Code, in order to divide the property into four lots. The proposed lots conformed to both the lot area and width requirements for the A-Residence zoning district.
The application process started in January 1987, and over the months that followed, the Planning Board considered, inter alla, countless memos from the Planning Department, counsel, and the town engineer, an archeological survey report, letters from the Montauk Fire Department, and the Suffolk County Planning Commission, correspondence, sketches, maps, surveys, photographs, and environmental assessment forms. There were hearings, conferences, and personal visits by Board members to the site.
There were many reasons why the process took so long. For one, there was the possibility the site had archeological significance. An inspection by archeologists hired by petitioner found artifacts scattered throughout the property. An encampment used by the Montauket Indians as a burial ground was approximately .2 miles to the south. The ridge on which the property was located also had historical value — just to the south was Montauk Manor and at the foot of the ridge, *624 nearby, was the Montauk Playhouse — both of which are on the National Register of Historic Places. Then too, the property was essentially steep ridgetop land, and the Board was concerned about "the dangers of soil erosion, driveway safety, and visual damage which result on steep slopes.”
Since the application involved obtaining permission from a "local agency,” it was an "action” within the meaning of the State Environmental Quality Review Act, or SEQRA (see, ECL 8-0105 [4]). The Planning Board was the "lead agency” and, as such, had the responsibility of determining whether the action would have a significant effect on the environment (see, ECL 8-0111 [6]). The application was an "unlisted” action pursuant to SEQRA, as well as chapter 75 of the Town Code, and thus a full environmental assessment form (EAF) was prepared (see, 6 NYCRR 617.2 [kk]), as well as a visual EAF addendum.
The EAF contained several parts: the second part covered the entire spectrum, e.g., it set forth the possible impact of the action on the land, water, air quality, aesthetic resources, historic resources, open space and recreation, etc.
The third part noted that because of the parcel’s proximity to a well field and the fact that, throughout, there was a wide distribution of slopes in excess of 20%, many mitigation measures were necessary, including use of indigenous vegetation for landscaping purposes and installation of staked straw bales to inhibit erosion. Also, to mitigate against the visual impact of structures along the ridge top, several other measures were recommended, including single story structures on 3 of the 4 lots, the use of traditional design and muted colors, and the placement of easements over areas in excess of 20% slopes.
The final part of the EAF (part IV) set forth the lead agency’s determination as follows: "Although the project could have a significant effect on the environment, there will not be a significant effect in this case because the mitigation measures described in Part III have been included as part of the proposed project.”
In other words, the end result was a conditional negative declaration (CND) (see, 6 NYCRR 617.2 [h]), and the applicant (petitioner) is objecting to some of the so-called "mitigation measures.”
It should be mentioned here that petitioner has gone along with a whole array of "measures” imposed by the Planning Board, e.g., that no excavation be done unless an archeologist *625 is present, that she grant a scenic and conservation easement in favor of the town, covering portions of three of the lots, and that she grant large lot easements in favor of the town, covering all the lots.
However, insofar as the measures she contests are concerned, as noted at the outset, she has two main contentions: first, that the Planning Board had no authority to do what it did, and second, if it did have authority, there was an abuse in this case.
On the issue of whether the Planning Board had authority, it would seem, generally, the answer is yes. The application here called for compliance with the procedural and substantive requirements of. SEQRA. The Planning Board, as the local agency to whom the application was being made, was the "lead agency,” and as the lead agency, it had the responsibility of determining whether the action might have a significant effect on the environment (see, ECL 8-0111 [6]; see also, Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay, 88 AD2d 484, 486).
The term environment, in the context of SEQRA, is very broadly defined. It means the physical conditions which will be affected by a proposed action, including land, air, water, minerals, flora, fauna, resources of agricultural, archeological, historic or aesthetic significance, and existing community or neighborhood character (see, 6 NYCRR 617.2 [,l]).
To assist in determining the environmental significance of the proposed action, and because it was an "unlisted” action, the Planning Board resorted to the use of an environmental assessment form (6 NYCRR 617.2 [m]). The record shows that referral was made to and comments were received from the Suffolk County Planning Commission, among others, and that the EAF was thoroughly prepared. For instance, in part II, question 11 calls for consideration of possible impact of the action on "aesthetic resources.” The short answer given was "Yes, potential large impact.” Then, it was noted that the parcel was visible from town-owned land which was available to the public for enjoyment of natural or man-made scenic qualities, including buildings on the National Register. The development would be visible to hundreds of thousands of seasonal visitors to Montauk, and since the vegetation at the top of the ridge was not as tall as that growing along Flamingo Avenue, lots 2, 3, and 4 posed the most significant visual impact on surrounding lands and waters. Could the impact be *626 reduced? The response was yes, by imposing the mitigating measures.
The EAF, as noted, also called for consideration of the possible impact on historic resources (question 12) and on open space and recreation (question 13). To both, the answer was yes, potential large impact. Could the impact be reduced? Again, yes, provided the mitigating measures were imposed.
In sum, the record shows that the Planning Board accepted and carried out the responsibilities which SEQRA imposed upon it as the lead agency. Further, the Town Code specifically directs the Planning Board to comply with the requirements of the Environmental Conservation Law with respect to local agency review of actions which may have a significant effect on the environment (East Hampton Code § 105-4). Thus, under State and local law, the Planning Board had the statutory authority to act in this case.
The second question is more specific, i.e., whether the Planning Board exceeded or abused its authority by imposing the conditions to which petitioner objects. The question, as posed, has two parts, viz., whether the Planning Board exceeded its authority, and, if not, whether it abused its authority.
As for the height restrictions, it appears that the Planning Board exceeded its authority. A reading of the history and background behind SEQRA reveals the Legislature never intended to infringe upon local law. There is nothing in the statute itself, or in the regulations promulgated by DEC to implement the statute, to suggest that compliance must be at the expense of local zoning ordinances. In fact, the opposite is true. ECL 8-0103 (6) provides: "It is the intent of the legislature that to the fullest extent possible the policies, statutes, regulations, and ordinances of the state and its political subdivisions should be interpreted and administered in accordance with the policies set forth in this article. However, the provisions of this article do not change the jurisdiction between or among state agencies and public corporations. ” (Emphasis added.)
As for the regulations, section 617.1 speaks of the Legislature’s intent in terms of requiring all agencies to conduct their affairs with an "awareness” of our natural resources, and of their obligation to "protect” the environment for future generations (6 NYCRR 617.1 [b]), and of making sure that protection and enhancement of the environment be given appropriate weight (with social and economic considerations) *627 in determining public policy. It also states that "[t]he basic purpose of SEQR is to incorporate the consideration of environmental factors into the existing planning, review and decisionmaking processes of * * * local government agencies at the earliest possible time” (6 NYCRR 617.1 [c]). Again, there is no hint that local laws must be scrapped. The mandate is that the agencies simply stop, look and listen before risking environmental impact. (See, Weinberg, Practice Commentary, McKinney’s Cons Laws of NY, Book 17 lá, ECL 8-0105, at 66.)
That was done here. The record is clear. The Planning Board diligently carried out its responsibility. But the parcel is located in an A-Residence zone, and section 153-11-10 of the East Hampton Code (the Table of Dimensional Regulations) contains specific height restrictions for residences in that zone. The residences can be 2V¡ stories, a maximum height of 25 feet, and a gabled roof, 32 feet. Here, the Planning Board, in order to protect the "vista”, is permitting only 22 feet or one story. The Planning Board has no authority to impose such a condition (see, 2 Anderson, New York Zoning Law and Practice § 21.11 [3d ed]). It would be analogous to requiring a lot coverage maximum of 10% in an area where the zoning ordinance permitted a maximum of 15%. That is something within the jurisdiction of a zoning board or town board, but not the Planning Board (see generally, Matter of Town of Poughkeepsie v Flacke, 105 Misc 2d 149, affd 84 AD2d 1).
It should be mentioned that the petitioner submitted to the Planning Board an affidavit from a licensed real estate broker (whose clients include the Town of East Hampton), which stated that the height restrictions would seriously impair the economic value of the parcel as a whole and the resultant lot values.
As for the restriction of muted natural colors, that is not something outside the Planning Board’s jurisdiction. The test is reasonableness, i.e., the condition must be reasonably related to the adverse impact identified in the conditioned negative declaration (6 NYCRR 617.3 [b]). As one court has noted, specific conditions must be subject to the " 'reasonableness test’ ”, if they are to survive judicial review (see, Matter of Town of Henrietta v Department of Envtl. Conservation, 76 AD2d 215, 224).
At bar, the EAF pointed out the potential impact the action would have on aesthetic and historic resources, on open space *628 and recreation, and on the existing community. The Planning Board, as lead agency, had the responsibility of acting affirmatively upon those adverse environmental impacts (see, Town of Henrietta v Department of Envtl. Conservation, supra, at 221). The Board’s response was measured. It did not prohibit construction — it only tried to soften the aesthetic or visual impact by requiring muted natural colors in construction. It appears to be reasonable.
The members of the Planning Board are there in the community. They are personally familiar with the parcel, the hamlet and the town. Based upon the record here, given the limited role the courts must play, it cannot be said the Board’s findings are not supported by substantial evidence. The fact that reasonable men may differ in matters of taste or style is not enough for a court to substitute its judgment for that of those at the scene (see generally, Matter of Currier v Planning Bd., 74 AD2d 872, affd 52 NY2d 722).
The petition is granted to the extent that all conditions imposing maximum height limits at odds with the town’s zoning code upon structures to be built on the lots are annulled.