Yvonne Scruggs-Leftwich, as Commissioner of the New York State Division of Housing and Community Renewal, Respondent, v Rivercross Tenants' Corp. et al., Appellants.

First Department, July 31, 1986

## APPEARANCES OF COUNSEL

*Judah Gribetz* of counsel *(Douglas M. Parker, Paul G. Burns* and *Donald H. Chase* with him on the brief; *Mudge Rose Guthrie Alexander & Ferdon,* attorneys), for appellants.

*Donna Miller* of counsel *(Robert Abrams, Attorney-General,* attorney), for respondent.

## OPINION OF THE COURT

SULLIVAN, J. P.

The Commissioner of the New York State Division of Housing and Community Renewal (DHCR) has brought this proceeding pursuant to Private Housing Finance Law § 32 (7) to enforce her order directing Rivercross, a State-assisted limited-profit housing company, to establish a tenant waiting list with respect to tenant-shareholder sales of stock allocated to its cooperative apartments, known as Mitchell-Lama units.

Organized in 1974 by DHCR's predecessor, the Urban Development Corporation (UDC), pursuant to Private Housing Finance Law article II as part of a plan for the development of Roosevelt Island as "a new community to include 5,000 units of housing for approximately 18,000 persons of low, moderate, middle and upper income", Rivercross owns and operates a 365-apartment cooperative residential facility on the island. DHCR, to the supervisory powers of which Rivercross is subject, has always been represented on Rivercross' board of directors, as was its predecessor, UDC, and maintains a constant presence in its day-to-day operation, as did UDC.

As a housing company under the Private Housing Finance Law, Rivercross receives substantial benefits from the State

through a low-interest mortgage loan,[1] as well as from the City of New York in the form of a real estate tax abatement. As with other projects on Roosevelt Island, Rivercross is also the beneficiary of a State subsidy in services including, but not limited to, transportation, security and management.

In accordance with housing regulations governing tenant selection procedures and fair housing practices, limited profit housing company shareholders who wish to sell their stock must select prospective purchasers from an established tenant waiting list and are prohibited from discriminating against any applicant. *(See,* 9 NYCRR 1727-1.1 *et seq.)* These regulations are intended to assure full and fair access to State subsidized housing in a manner that precludes unfair preferences or illegal payments.

At the time Rivercross was organized, UDC was experiencing widely publicized financial difficulties, which caused some concern as to whether it had the ability to complete the development plan. In addition, even before it began offering Rivercross' stock for sale, UDC recognized that the isolated location of Roosevelt Island and lack of adequate transportation might make Rivercross unattractive to the general public. This concern prompted UDC to retain a well-known commercial sales agent and employ traditional promotional techniques, including extensive advertising, to attract buyers.

Rivercross' offering plan, disseminated in 1976 by UDC, set forth the special inducements offered to prospective purchasers, such as its commitment to repurchase the shares of stock allocated to the apartments at any time prior to the fifth anniversary of the closing date. The plan stated that the operation of Rivercross was subject to relevant laws and regulations and to the supervision of the appropriate State agencies. It also stated that the proprietary lease was subject and subordinate to the restrictions and limitations imposed by law as well as UDC's regulations.

Despite the existence of a regulation requiring the maintenance of tenant waiting lists—the regulation upon which the Commissioner bases this proceeding—the plan represented to prospective purchasers that, subject to statutory limitations on resale price and purchaser income regulations (which are not at issue here), Rivercross residents would be free to sell the

---

1. UDC committed approximately $23,000,000 in low-interest mortgage loans to the Rivercross project.

shares to their apartments to persons of their choice. The plan's provisions on the subject, which were never amended, could not have been clearer:

"Unlike many other cooperatives organized under the Act, the Housing Company does not reserve any right of first refusal with respect to sales of Apartments * * *

"Unlike many other cooperative housing corporations organized under the Act, the Housing Company does not have the right of first refusal to purchase an Apartment from a Tenant-Shareholder who proposes to sell his Apartment * * *

"A Tenant-Shareholder may sell or transfer his Apartment to any individual for the Resale Price".

As the record demonstrates, Rivercross is unique among housing companies organized under Private Housing Finance Law article II. Leases governing other such cooperatives routinely and explicitly provide for the housing company's right of first refusal, including the right to designate the person to whom the seller must sell his cooperative shares. A typical clause reads: "The Cooperator agrees to sell to the Company, or such person * * * as may be designated by the Company, all stock of the Company owned or held by the Cooperator". Normally the designee is selected from a waiting list. Furthermore, and significantly, while these other leases refer to the housing company's bylaws for the mechanics of implementing the right of first refusal and utilization of a tenant waiting list, Rivercross' bylaws—which were prepared by UDC and have been expressly approved by DHCR as conforming in all respects with the Private Housing Finance Law and all of DHCR's applicable rules and regulations—fail to provide for either a right of first refusal or a waiting list.

As reflected in the offering plan, UDC further evidenced its determination that Rivercross was to differ from other Mitchell-Lama cooperatives by the grant to its shareholders of the clear and unequivocal right to make and sell improvements to their apartments: "Although the Act imposes a limit on the price for which a Tenant-Shareholder can sell his Apartment, it has no provisions restricting sales of personal property in the Apartment, such as draperies, cabinet work or other improvements. Accordingly, a Tenant-Shareholder may make arrangements to sell such personal property, although the purchaser would not be able to add such amount to the price he paid for his Apartment for purposes of computing the

Resale Price." This right is denied to shareholders in other Mitchell-Lama cooperatives.[2]

Furthermore, all sales of Rivercross shares must be approved by both its board of directors (one member of which has always been appointed by DHCR) and DHCR to assure that each sale complies with all the provisions of the proprietary lease, including the resale price and purchaser income limitation restrictions. From the time it assumed UDC's responsibilities over the sales of cooperative apartment shares in 1979 until May 1984, DHCR consistently sanctioned Rivercross' resale procedures and acknowledged the right of Rivercross shareholders to dispose freely of the stock to their apartments, including any improvements made therein, to qualified persons of their choosing. In 1979, DHCR reviewed Rivercross' bylaws, house rules and proprietary leases to determine whether it was being operated and maintained in compliance with applicable laws and regulations. At the conclusion of its review, DHCR's housing management representative, who was also a member of Rivercross' board of directors, advised Rivercross' president, "A review of the Proprietary Lease, House Rules (as revised 2/14/79) and the By-Laws (as revised 10/17/78) show that they conform to the UDC Act, PFA Act, the Private Housing Finance Law and the rules and regulations of the Commissioner. Therefore, no modification is necessary at this time by reason of the transfer of supervision from UDC to DHCR."

In May 1980, shortly after its review of the controlling documents, the DHCR housing management representative approved Rivercross' "Instructions to Sellers and Purchasers of Apartments in Rivercross" and "Instructions to Tenant Shareholders who Intend to Sublet their Apartments in Rivercross", neither of which provided for a waiting list. From 1980 and through 1983, he conducted field visits and examined various aspects of Rivercross' operation, including its tenant selection process. Following each of these visits, he concluded

---

2. Rivercross differs in other respects also. Both the offering plan and proprietary lease state that the lease is to remain in effect until September 30, 2027. Other Mitchell-Lama leases limit the leasehold term to three years. The plan and proprietary lease specifically contemplate that a Rivercross shareholder may pledge his shares to a secured party as collateral for a loan to finance the purchase of such shares. This right is generally denied to other Mitchell-Lama cooperative shareholders. Such secured parties also have rights under the proprietary lease separate and distinct from the rights of the tenant-shareholders and which are specifically confirmed to each lending bank in a DHCR approved recognition agreement.

that the existing selection procedures were entirely proper. Indeed, at the conclusion of his February 1983 inspection he noted, "At this Housing Company Co-op Apartments are sold privately. There is no waiting list. This is in accordance with the offering statement and Proprietary Lease."

Beginning in May 1984, however, DHCR imposed a blanket freeze on the sale of all shares of stock for the cooperative apartments and advised Rivercross and prospective sellers that any sale theretofore approved would be rejected unless and until a tenant waiting list was established, and that no sale would be approved unless the prospective seller waived his right to sell apartment improvements. On July 24, 1984, after Rivercross refused to establish such a list, the Commissioner issued the order sought to be enforced herein. While DHCR has relented, after considerable delay and hardship to the parties involved, with respect to several of the sales not made from a waiting list, it has steadfastly refused to approve any sales of improvements.

Until the current freeze, DHCR consistently approved sales which also included improvements, as to which, by virtue of the disclosure and substantiation of value requirements, it was and continues to be fully informed. Now, however, as a result of DHCR's ban on such sales, many prospective sellers who, in reliance upon the offering plan's specific representation that they could sell their improvements on resale, expended substantial amounts in improving their apartments, are in the position of either forfeiting their significant investments or maintaining apartments which they would otherwise be prepared to sell. In addition, those shareholders who purchased improvements from prior owners—in sales transactions approved by DHCR over the five-year period preceding the commencement of this proceeding—now learn that these improvements are worthless.

After Rivercross' refusal to comply with her July 24, 1984 order, itself a violation of the Private Housing Finance Law (§ 32 [7]) and applicable regulations (9 NYCRR part 1727), the Commissioner commenced this proceeding for a judgment directing compliance and permanently enjoining Rivercross and its shareholders from selling shares to anyone not on a waiting list. In its answer Rivercross interposed affirmative defenses based on, *inter alia,* unconstitutional impairment of the shareholders' contractual rights and estoppel, as well as counterclaims for a judgment pursuant to CPLR article 78,

annulling the July 24, 1984 order as arbitrary and capricious, and for injunctive relief pending disposition of the proceeding.

On the Commissioner's motion for summary judgment, Special Term permanently enjoined Rivercross from operating without a waiting list and stayed the shareholders from selling their stock to anyone not selected from such a list. In so ruling, the court held that the proprietary lease is expressly made subordinate to the Private Housing Finance Law and DHCR's regulations, and that to the extent the bylaws governing the operation and management of Rivercross are inconsistent, the provisions of the Private Housing Finance Law and the regulations prevail. It did not specifically address the issue of whether DHCR was authorized to prohibit the sale of improvements, and dismissed the counterclaims as meritless. We reverse, and dismiss the petition.

In our view, Special Term erred in relying upon the clauses in the offering plan and its incorporated operative documents[3] that state, in effect, that Rivercross is obligated to comply with the provisions of the Private Housing Finance Law and DHCR's rules and regulations. Those general references to the Private Housing Finance Law and the regulatory provisions implementing it cannot override specific provisions expressly to the contrary. The language requiring compliance with the Private Housing Finance Law and DHCR's rules and regulations must be read in conjunction with the offering plan's clear and unequivocal representation, set forth in highlighted type in two places and at a time when the regulations providing for tenant waiting lists were in existence, that, "Unlike many other cooperatives organized under the Act, the Housing Company does not reserve any right of first refusal with respect to sales of Apartments." Given the foregoing representation, any prospective purchaser, even if aware of their existence, could only conclude that the waiting list regulations had no application to Rivercross. Even DHCR recognized that fact by expressly and consistently finding that Rivercross' tenant selection procedures complied with the Private Housing Finance Law and its own rules and regulations. Similarly, in the clearest of terms, UDC's offering plan acknowledged that the Private Housing Finance Law "has no provision restricting sales of personal property in the Apartment * * *

---

3. These documents are the purchase agreement, income affidavit, proprietary lease and repurchase agreement, income regulations, certificate of incorporation and bylaws.

[and a]ccordingly, a Tenant-Shareholder may make arrangements to sell such personal property".

Private Housing Finance Law article II was enacted as a mechanism to create limited profit housing companies, which, aided by private enterprise and "regulated by law as to rents, profits, dividends and disposition of their property" (§ 11),[4] were intended to provide housing for low-income families. The regulations promulgated thereunder authorize the Commissioner, to supervise and regulate housing companies in virtually every aspect of their operations, including the tenant selection process. (9 NYCRR parts 1700-1740.) Pursuant to sections 1727-1.1 and 1727-1.3 of the regulations, housing companies are required to maintain tenant waiting lists and to follow a fair housing marketing plan. As stated therein, these requirements assure equal access to, and nondiscrimination in, publicly funded housing.

While DHCR's supervisory power over Rivercross is concededly broad, it is not limitless. Private Housing Finance Law § 32 (3) authorizes the supervising agency to promulgate rules and regulations to effectuate the provisions of article II, provided that such rules and regulations "shall be strictly limited in their application to the means and methods of compliance with the provisions of this article". The Commissioner's July 24, 1984 order and her insistence upon the waiver of the right to sell improvements impermissibly exceeded those limits since they directly contravened UDC's representations that Rivercross' shareholders would be free to dispose of their stock and improvements to persons of their choice. These representations, stated in clear and unequivocal terms in the offering plan, were material and obviously intended to induce the purchase of shares. UDC had to know that prospective purchasers would rely upon them. In fact, we are told, past and current shareholders did rely on them in

---

4. Private Housing Finance Law § 31-a provides for a statutorily permissible resale price for a Mitchell-Lama cooperative. In essence, the laws governing the resale price of shares in limited-profit cooperative apartments were intended to provide an equitable return to the shareholders. Before its enactment (L 1971, ch 1148), a cooperator could sell his shares only for the price he paid for them. Under section 31-a and its subsequent amendments shareholders can recover part of the amortization of the mortgage. The Governor's memorandum contained in the bill jacket accompanying the Senate Bill for Laws of 1971 (ch 1148) indicates that the law was intended, *inter alia,* to guard against precipitous rises in the cost of Mitchell-Lama housing, which increases might have the effect of removing such units from their intended beneficiaries, and to deter the payment of key money.

relocating to Rivercross and, in many instances, expending substantial sums of money in improving their apartments. Furthermore, DHCR actively participated in the resale process for several years and on numerous occasions expressly acknowledged that Rivercross' resale procedures were in compliance with all of its applicable rules and regulations. In such circumstances, DHCR should be estopped from changing the resale procedures currently in effect at Rivercross without a showing of compelling necessity and due consideration to the hardship such changes would cause those shareholders who, in reliance upon the present procedures, made substantial improvements to their apartments or, on resale, purchased such improvements at a significant cost.

Special Term refused to apply the doctrine of estoppel because it found that DHCR was acting in a governmental capacity. To be sure, the enforcement of the Private Housing Finance Law and its implementing regulations constitutes an exercise of the sovereign powers of government. *(See, Matter of Vinson v Greenburgh Hous. Auth.,* 29 AD2d 338, 340, *affd* 27 NY2d 675 [low-rent housing recognized as a proper governmental function under NY Const art XVIII]; *Peters v New York State Urban Dev. Corp.,* 41 AD2d 1008 [Urban Development Corp.'s construction of apartment complex found to be a constitutional exercise of the State's police power and a governmental, not proprietary, function].) A governmental agency may be estopped, however, even when acting in its governmental capacity, if a manifest injustice would otherwise occur. *(See, Bender v New York City Health & Hosps. Corp.,* 38 NY2d 662, 668; *Landmark Colony v Board of Supervisors,* 113 AD2d 741; *Matter of 1555 Boston Rd. Corp. v Finance Administrator of City of N. Y.,* 61 AD2d 187, 192; *Eden v Board of Trustees of State Univ.,* 49 AD2d 277, 283-284.) Concededly, estoppel should be invoked "only in truly exceptional cases, involving, as it often does, an intrusion, *pro tanto,* by the judiciary, into the prerogatives of other branches of the government." *(Eden v Board of Trustees of State Univ.,* 49 AD2d, at p 284.) In our view, enforcement of the Commissioner's order and the indiscriminate ban on the sale of any improvements would result in manifest injustice to those Rivercross shareholders who relied to their financial detriment on the representations of UDC, and, later, on the conduct and representations of DHCR, with respect to their resale rights.

Although implementation of a waiting list would not otherwise impede sales of the cooperative stock since the resale

price is statutorily fixed, it would, however, strip the shareholders of whatever leverage they might otherwise have in the negotiation of a sale of their improvements. Thus, it seems apparent, the nub of the controversy is the loss of the right to sell improvements. In this regard, the Commissioner has a legitimate concern in preventing Rivercross' stock from being sold, in the guise of a sale of improvements and in contravention of law, to the highest bidder. No court should protect a shareholder's anticipated profit in the sale of the shares to his Mitchell-Lama cooperative apartment. Rivercross' proprietary lease specifically provides that the "purchase of an apartment is made in order to obtain and own a place to live and should not be regarded as an 'investment decision' ". Indeed, in deciding that cooperative shares in Mitchell-Lama housing are not securities, the Supreme Court has noted, "In short, the inducement to purchase was solely to acquire subsidized low-cost living space; it was not to invest for profit." *(United Hous. Found. v Forman,* 421 US 837, 851.)

The Commissioner, however, cannot justify her directives merely because they serve a public purpose. The applicable regulations currently in effect at Rivercross provide for a resale price ceiling, purchaser income limitations, DHCR approval of all sales, and other restrictions, all designed to assure that the Private Housing Finance Law's purposes are achieved. Indeed, on this record, there is no evidence that the regulations as heretofore applied are inadequate to prevent discriminatory practices and profit-making in the sale of Rivercross' cooperative stock.[5] And, as Rivercross asserts, and it is not denied, its present racial and ethnic composition confirms that the current resale procedures have accomplished the goal of nondiscriminatory housing. Furthermore, to the extent that any abuse of the improvement sale practice exists, it can be cured, as the Commissioner has conceded, by an appropriate independent appraisal mechanism.

In deciding, as we have, we in no way imply that the shareholders at Rivercross have a contractual right either to sell to a buyer of their choice or to sell their improvements.

5. The single instance of alleged impropriety in which the sellers of Rivercross cooperative stock and their counsel were indicted for allegedly failing to divulge to DHCR and Rivercross that payments in excess of the statutory resale price (key money) were made hardly provides a basis for the unilateral abrogation of a benefit conferred by the offering plan to shareholders who in good faith have and continue to adhere to Rivercross' resale procedures and restrictions.

Thus, we need not reach Rivercross' argument that the Commissioner's directives unconstitutionally impair the shareholders' contractual rights. To accept such an argument would necessitate endowing the shareholders with a perpetual right to sell their stock and improvements to whomever they choose. Nor should our determination be construed as sanction for the operation of Rivercross as a private cooperative. DHCR's regulatory power over Rivercross is as obvious as it is broad. We merely hold that the Commissioner has failed to demonstrate a compelling change in circumstances to justify the abrupt revision in Rivercross' resale procedures without regard for the equity that some or all the shareholders may have in their improvements. Under the circumstances presented, the original purchasers as well as those shareholders who purchased improvements already installed by prior owners pursuant to purchase agreements specifically approved by DHCR or its predecessor, UDC, had a right to rely on UDC's offering plan representations, as well as upon DHCR's conscious decision to adhere unfailingly to those representations.

Accordingly, the judgment of the Supreme Court, New York County (Irving Kirschenbaum, J.), entered October 25, 1985, which, *inter alia,* permanently enjoined Rivercross' shareholders from selling their cooperative stock to prospective buyers not selected from a tenant waiting list and directed Rivercross to establish such a list, should be reversed, on the law, without costs or disbursements, the petition dismissed and petitioner's July 24, 1984 order annulled.

CARRO, FEIN and MILONAS, JJ., concur.

Judgment, Supreme Court, New York County, entered on October 25, 1985, unanimously reversed, on the law, without costs and without disbursements, the petition dismissed and petitioner's July 24, 1984 order annulled.