E.F.S. VENTURES CORP., Appellant, v DEBRA FOSTER et al., Respondents. (Proceeding No. 1.)

E.F.S. VENTURES CORP., Appellant, v JOSEPH DeCHRISTOFARO, Respondent. (Proceeding No. 2.)

Second Department, April 20, 1987

APPEARANCES OF COUNSEL

*Paul, Weiss, Rifkind, Wharton & Garrison (Edward N. Costikyan* and *Bruce Buremboim* of counsel), for appellant.

*Scheinberg, Schneps, DePetris & DePetris (Richard E. DePetris* of counsel), for respondents.

## OPINION OF THE COURT

Per Curiam.

The petitioner, E.F.S. Ventures Corp., is the owner of approximately 5.2 acres of real property located on Old Montauk Highway in the Town of East Hampton. This property had been improved by a small motel and surrounding cottages which, collectively, were known as the Beachcomber. Shortly after purchasing the property, the petitioner submitted a site plan application to the respondent Planning Board of the Town of East Hampton which called for the improvement and

upgrading of the existing motel units as well as the construction of certain additional units. The foregoing application was considered by the Planning Board and was ultimately approved, on September 29, 1982, without the benefit of any environmental impact study.*

On January 26, 1983, the petitioner submitted a further application wherein it sought to modify the site plan to include, *inter alia,* the erection of an additional building. The Planning Board, in response, directed that an environmental assessment form be prepared. This form was ultimately prepared, in part, by the petitioner and, in part, by an independent consultant retained by the Planning Board. After evaluating the information contained in this form, the Board, pursuant to the State Environmental Quality Review Act (hereinafter SEQRA; ECL 8-0101 *et seq.)* issued a formal "negative declaration", based on its determination that the amendment would result in a "potential overall small to moderate impact on the environment" which could effectively be mitigated by the measures delineated in the environmental assessment form. Accordingly, on March 17, 1983, a resolution adopting the petitioner's modified site plan was filed with the Town Clerk and construction commenced shortly thereafter.

Approximately one month later, on or about April 14, 1983, certain local residents who opposed construction of the project initiated a proceeding pursuant to CPLR article 78, in an effort to set aside the Planning Board's resolution which granted the petitioner permission to proceed with the construction. These residents alleged in their petition that the Board's resolution was of questionable validity, primarily because the requirements of SEQRA had not been complied with nor satisfied. A preliminary injunction to halt all construction during the pendency of the CPLR article 78 challenge was denied, and the petitioner continued to work on the construction project in accordance with the specifications contained in the approved modified site plan.

The aggrieved local residents were ultimately successful in their bid to set aside the Planning Board's determination and, on October 12, 1983, the matter was remitted to the Board for a de novo examination of the modified site plan in order to

---

* By resolution dated December 1, 1982, the Planning Board of the Town of East Hampton approved the petitioner's application to amend the original site plan, in minor respects. This resolution was similarly adopted in the absence of any environmental impact study.

ensure compliance with the requirements of SEQRA. The court, additionally, enjoined the issuance of certificates of occupancy for 64 units which had already been constructed or renovated under previous approvals.

The petitioner, in the interim, appealed to this court. While that appeal was pending, however, the Planning Board, pursuant to Special Term's judgment, was in the process of conducting a de novo examination of the modified site plan in order to ascertain the environmental ramifications of the project.

On April 15, 1985, this court modified the judgment of Special Term, to the extent of vacating the prohibition against the issuance of certificates of occupancy with respect to the 64 constructed units. We did so on the ground that this relief was precluded due to the passage of the four-month Statute of Limitations. The judgment, in all other respects, was affirmed. This court stated that "the planning board's initial finding of nonsignificance did not take into account the designated environmental criteria, as mandated by 6 NYCRR 617.11 (a) (1)-(11). The subsequent preparation of environmental assessment forms does not vitiate the planning board's *failure to literally comply with the statutory mandate*" (*Matter of Nielsen v Planning Bd.*, 110 AD2d 767, 768; emphasis supplied). Thus, we concluded that the Planning Board's determination was properly annulled by Special Term and that a de novo examination, pursuant to the precepts of SEQRA, was required *(see, Matter of Nielsen v Planning Bd., supra)*.

Meanwhile, in accordance with Special Term's directives mandating a de novo review of SEQRA considerations, a decision which, as noted, was held by this court to be legally correct, a draft and then a final environmental impact statement were prepared and submitted. These statements disclosed the existence of numerous major adverse impacts upon the environment which would result from the construction as proposed, including drainage problems, disruption of a wildlife corridor, limited site distance of access roadways, and insufficient interior traffic circulation for emergency vehicles. Following a public hearing, the Planning Board, possessed of the foregoing information, voted to grant site plan approval subject to conditions requiring the petitioner to implement various measures to minimize the adverse environmental impacts of the construction. The most significant of these measures called for the destruction of 10 motel units, located in three separate buildings. The Planning Board's resolution further required, *inter alia,* that landscape plans be modified and that

certain roadways be relocated. Once notified of the Planning Board's determination requiring the destruction of 10 motel units, which were already constructed, the petitioner submitted various alternate proposals which, it maintained, would effectively alleviate the adverse environmental impacts referred to by the Board, but which would also avoid the burdensome and costly destruction of 10 completed units. The Board, thereafter, considered all of the proposals and ultimately adhered to its determination that the destruction of the motel units would be the most efficacious means of minimizing adverse environmental impacts.

On October 4, 1984, the petitioner commenced proceeding No. 1 in an effort to set aside the Planning Board's determination. The petitioner claimed, in essence, that the modifications and conditions imposed by the Board were arbitrary and capricious and that it was legally entitled to retain all 92 existing units situated on the property. Special Term, however, concluded that the Planning Board had arrived at an acceptable balance between the conflicting interests, that the Board's determination was based upon substantial evidence, and that the petitioner by "proceeding full tilt" with construction during the pendency of a proceeding pursuant to CPLR article 78, had completed the project "at its peril". Special Term, accordingly, dismissed proceeding No. 1 on the merits.

On or about May 15, 1985, the petitioner initiated a second proceeding pursuant to CPLR article 78 (proceeding No. 2) seeking to compel the building inspector to issue 64 permanent certificates of occupancy for units constructed pursuant to earlier site plan approvals. The building inspector had previously agreed to issue 58 temporary certificates of occupancy but refused to issue the remaining 6 certificates, inasmuch as these certificates referred to 6 of the 10 units which were ordered to be destroyed. In addition, the building inspector had refused to issue any permanent certificates of occupancy until the petitioner fully complied with all of the conditions and modifications required by the Planning Board.

Special Term, on August 5, 1985, dismissed proceeding No. 2, finding no legal predicate upon which to justify a judgment compelling the building inspector to issue the certificates of occupancy. The petitioner now appeals from each of the judgments dismissing its proceedings.

■ The central question to be resolved on these appeals is whether the Planning Board of the Town of East Hampton

may, under the aegis of SEQRA, impose conditions upon or require modifications to a construction project which had already been completed in reliance upon previous site plan approvals. Under the circumstances of this case, this question must be answered in the affirmative.

SEQRA and its implementing regulations require agencies to "act and choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable, minimize or avoid adverse environmental effects" (ECL 8-0109 [1]). Accordingly, "[a]n agency *may not* approve an action unless it makes 'an explicit finding that the requirements of [SEQRA] have been met and that consistent with social, economic and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided' (ECL 8-0109 [8]; *see,* 6 NYCRR 617.9 [c] [2] [i])' " *(see, Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 416; emphasis added).

It is readily apparent, from the express language utilized in the regulatory scheme, as well as from pertinent decisional authority, that literal compliance with the review procedures set forth in SEQRA is required, and that even substantial compliance is insufficient *(see, e.g., Glen Head—Glenwood Landing Civic Council v Town of Oyster Bay,* 88 AD2d 484; *Matter of Niagara Recycling v Town Bd.,* 83 AD2d 335, *affd* 56 NY2d 859; *Matter of Rye Town/King Civic Assn. v Town of Rye,* 82 AD2d 474, *lv dismissed* 56 NY2d 985, *rearg denied* 57 NY2d 775)*. Notwithstanding its obligation to strictly comply with prescribed procedures, the Planning Board, as we noted in the prior appeal, never considered the environmental ramifications of the proposed construction when it initially granted site plan approvals to the petitioner and, following a cursory examination, apparently rendered an erroneous determination of nonsignificance when it passed upon petitioner's application to modify the site plan. For this reason, both Special Term and this court ordered a de novo examination of the environmental impacts and declared, in effect, that the prior approvals were invalid. The petitioner, nevertheless, chose to proceed with and virtually complete construction, despite the fact that the validity of the approvals upon which it relied were actively being challenged in a court of law. Although a preliminary injunction to halt construction during the pendency of the challenge pursuant to CPLR article 78 had been denied, this denial was not tantamount to an adjudication that the

approvals were valid. The petitioner simply cannot be said to have acquired immutable rights with respect to the construction project merely because it made construction expenditures in reliance upon potentially invalid approvals. Nor can the petitioner fairly claim that it assumed no risk when it continued with the construction project before the pending litigation was finally resolved.

■ Although our dissenting colleague suggests that the petitioner, armed with a resolution approving its original and modified site plan proposals, acted in good faith when it proceeded with the construction, and that the Planning Board should, therefore, be equitably estopped from imposing mitigation measures as a condition of approval of the modified site plan, we cannot agree.

It is firmly established in this State, that the defense of estoppel may not be invoked against a governmental entity where that entity is acting in its governmental capacity *(see, Matter of Hamptons Hosp. & Med. Center v Moore,* 52 NY2d 88; *Hartford Ins. Group v Town of N. Hempstead,* 118 AD2d 542; *Matter of Milano v New York State Dept. of Health,* 108 AD2d 916; *New York State Inspection, Sec. & Law Enforcement Employees v Cuomo,* 103 AD2d 312, *affd* 64 NY2d 233). Nor is estoppel available for the purpose of ratifying an administrative error *(see, Morley v Arricale,* 66 NY2d 665). These rules are not only conceptual, but pragmatic, for it would be counterproductive and ultimately harmful to the public to prevent an agency from fulfilling its legislatively ordained public function. It would be equally detrimental to bind an agency to a prior determination which was made in direct contravention of a statute enacted for the benefit of the public. While we are not insensitive to the petitioner's plight, we decline to blaze new trails by adopting a position which, in the final analysis, would preclude a governmental agency from discharging its statutory obligations. The salutary objectives underlying the enactment of SEQRA would be thwarted were we to estop a municipal entity from enforcing its mandate. We know of no New York case, nor has any been identified by our dissenting colleague, where an equitable estoppel defense has been successfully invoked to undermine legislation specifically designed for the protection of the public. Rather, it appears that "estoppel can never be used to prevent the State from enforcing its laws or * * * an agency from carrying out its duties" *(see, Matter of City of New York v New York State Dept. of Envtl. Conservation,* 89 AD2d 274, 276).

Our decision to reject the defense of estoppel herein is further reinforced by the fact that the petitioner continued with the construction project despite its actual knowledge of pending litigation affirmatively challenging the propriety of the Planning Board's resolution. We therefore find, as did Special Term, that the petitioner proceeded at its own peril by completing construction in the midst of unresolved litigation *(see, Matter of Alpert v Town of Carmel Zoning Bd. of Appeal,* 89 AD2d 853), and that the hardship of which the petitioner now complains is attributable to its conscious decision to proceed, and, therefore, constitutes a self-created hardship. While we recognize that the courts are generally reluctant to grant relief which would effectively prohibit a *fait accompli (see, Town of Oyster Bay v New York Tel. Co.,* 75 AD2d 598), this rule should not be extended to a situation where, as here, the "accomplishment" of the very "fact" in issue appears to be the product of the petitioner's efforts to complete the project prior to the rendition of a potentially unfavorable judicial determination regarding the validity of the March 17, 1983, resolution *(see, Shumaker v Town of Cortlandt,* 124 AD2d 129).

■ We further conclude that the petitioner's purported reliance upon invalid site plan approvals may not be utilized as justification for circumventing the requirements of SEQRA. Nor does this reliance operate to estop the agency, in the instant circumstances, from thereafter imposing new conditions or modifications to minimize significant adverse environmental impacts. Any holding to the contrary would effectively render meaningless this court's prior decision which specifically directed the Planning Board to conduct a de novo examination of SEQRA considerations, and implicitly, required the Planning Board to render a determination which, in its view, would best effectuate the important objectives of that statute. Simply stated, the Planning Board in the instant case merely did what it was instructed by this court to do.

The Legislature, in enacting SEQRA, has devised a statutory scheme whereby lead agencies are required "to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources" (ECL 8-0101). SEQRA is a substantive rather than procedural act *(see, Matter of Town of Henrietta v Department of Envtl. Conservation,* 76 AD2d 215), and the provisions contained therein are intended to minimize, to the greatest degree possible, the adverse environmental consequences of any proposed construction project. While it would indeed be a "manifest injustice"

as well as a deprivation of due process to require substantial building alterations on the basis of a law which was not in force at the time of the commencement of the construction project *(see, Matter of Bexson v Board of Zoning & Appeals,* 28 AD2d 848, *affd* 21 NY2d 961), we believe that it would be inappropriate as well as legally erroneous to foreclose the lead agency at bar from enforcing the mandate of SEQRA merely because this agency initially failed to literally comply with the statute or because the petitioner elected to complete the project, notwithstanding the existence of pending litigation. "Requiring strict compliance by agencies with SEQRA's * * * requirements is more than a hollow procedural nicety" *(see, Matter of Schenectady Chems. v Flacke,* 83 AD2d 460, 463). Accordingly, enforcement of the provisions of SEQRA should neither be suspended nor dispensed with; rather, it is the Planning Board's initial approvals which should be set aside *(see, Chinese Staff & Workers Assn. v City of New York,* 68 NY2d 359; *Matter of Tri-County Taxpayers Assn. v Town Bd.,* 55 NY2d 41). Therefore, the imposition by the Board of mitigation measures, including the destruction of 10 completed units, is a necessary, albeit unfortunate, consequence of the enforcement of a remedial statute previously misapplied or disregarded *(see, Shepard v Village of Skaneateles,* 300 NY 115; *Altschul v Ludwig,* 216 NY 459; *154 E. Park Ave. Corp. v City of Long Beach,* 76 Misc 2d 445, *mod on other grounds* 49 AD2d 949, *affd* 52 NY2d 991, *cert denied* 454 US 858).

Having determined that the Planning Board was legally obligated to review the environmental impacts of the construction project in accordance with the precepts embodied in SEQRA, and that the prior determinations of the Board, made in the absence of full compliance with SEQRA, were, in effect, null and void *(see, Chinese Staff & Workers Assn. v City of New York, supra; Matter of Tri-County Taxpayers Assn. v Town Bd., supra),* we turn now to the question of whether the remedial scheme promulgated by the Planning Board was arbitrary and capricious.

It is firmly established that the standard of judicial review for SEQRA challenges is quite limited. A court may overturn an agency's determination only when it is "in violation of lawful procedure * * * affected by an error of law or * * * arbitrary and capricious or an abuse of discretion" *(see,* CPLR 7803 [3]; *Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 416, *supra; Horn v International Business Machs. Corp.,* 110 AD2d 87, *lv denied* 67 NY2d 602). If the

record establishes that the responsible agency has taken a "hard look" at the relevant areas of environmental concern, and has made a reasoned judgment, the agency's determination will not be disturbed *(see, Aldrich v Pattison,* 107 AD2d 258)*. It should be noted, moreover, that a reviewing court does not, in the context of a proceeding pursuant to CPLR article 78, have the authority to substitute its own discretion for that of the lead agency.

■ The Planning Board at bar considered the environmental impact statements, and the opinions of engineers, the local fire department, neighboring residents, and the petitioner. It additionally reviewed the petitioner's alternate proposals to mitigate adverse environmental impacts, and the financial ramifications to the petitioner and, after evaluating these considerations, arrived at its determination. As Special Term aptly noted in its decision, the resolution which the petitioner now challenges is the product of a "careful analysis of the environmental problems presented by this motel development". It is readily apparent, and even the petitioner does not dispute, that the Planning Board took a "hard look" at the relevant areas of environmental concern *(see, Aldrich v Pattison, supra,* at 265-266; *Horn v International Business Machs. Corp., supra)*. Although many of the concerns identified by the Planning Board could, arguably, have been mitigated by adopting the off-site alternative measures proposed by the petitioner, "it is not the role of the courts to weigh the desirability of any action or choose among alternatives, but to assure that the agency itself has satisfied SEQRA, procedurally and substantively" *(see, Matter of Jackson v New York State Urban Dev. Corp., supra,* at 416). Nor should the court " 'interject itself within the area of discretion of the executive as to the choice of the action to be taken' " *(see, Coalition Against Lincoln W. v City of New York,* 94 AD2d 483, 492, *affd* 60 NY2d 805, *rearg denied* 61 NY2d 670).

On the basis of the record before us, we are compelled to conclude that the Planning Board's determination was not arbitrary and capricious, and must, therefore, be sustained.

Although we are constrained to uphold the determination of the Planning Board, based upon the limited scope of our review powers, we take this opportunity to stress the importance of early consideration of the environmental impacts of a proposed construction project *(see, Matter of Sun Beach Real Estate Dev. Corp. v Anderson,* 98 AD2d 367, *affd* 62 NY2d 965; *Devitt v Heimbach,* 89 AD2d 920, *affd* 58 NY2d 925). Indeed,

had the Planning Board properly fulfilled its obligation to evaluate SEQRA considerations when first presented with the construction plans, the consequences of this litigation could have been avoided.

■ Contrary to the petitioner's assertions, however, the fact that the Planning Board ultimately required the destruction of 10 completed units, some of which had been fully constructed prior to the initiation of litigation, does not mandate reversal. The Planning Board was required, by SEQRA, to act affirmatively to lessen the adverse environmental effects of the construction (see, ECL 8-0109 [1], [8]). The Board's obligation to impose those conditions which it deemed necessary to minimize or avoid all adverse environmental impacts extended to the entire project and was not limited to the Board's March 17, 1983 resolution which erroneously approved the modified site plan (see, Matter of Town of Henrietta v Department of Envtl. Conservation, 76 AD2d 215, 223, supra).

Indeed, although the petitioner now claims that the Planning Board should be precluded from requiring any modification of the units which were renovated and/or constructed pursuant to the resolution approving the original site plan, even our learned dissenting colleague agrees that the petitioner, by seeking approval of the modified site plan, exposed the entire project to de novo review and that the Planning Board was, therefore, legally obligated to assess the environmental impact of the project as a whole and not merely the impact of the units referred to in the modified plan. Clearly, if the petitioner had proceeded with the unchallenged site plan approved in September of 1982 and had not sought to expand the project, the dilemma which it now faces would have been avoided. The fact, nevertheless, remains that the petitioner, by choice, submitted the modified site plan for approval and as a result should not be heard to complain of the consequences of that decision.

Furthermore, although the dissent suggests that "noncomprehensive consideration of a project divisible into smaller parts * * * would provide a clear loophole in SEQRA", it should be emphasized that the statute is a product of legislative efforts to "save the environment and preserve it for future generations" (see, Matter of Sun Beach Real Estate Dev. Corp. v Anderson, supra, at 375). Therefore, the concern of the courts should be to fully enforce the statute rather than create loopholes.

We note, moreover, that the recent case of *Golden v Metropolitan Transp. Auth.* (126 AD2d 128), is not inconsistent with our decision herein. Although this court, in *Golden,* recognized that "once a violation of SEQRA has been shown, the proper remedy is to annul whatever agency determinations may have been made in the absence of full compliance with SEQRA *(see, Chinese Staff & Workers Assn. v City of New York,* 68 NY2d 359; *Matter of Tri-County Taxpayers Assn. v Town Bd.,* 55 NY2d 41)" *(Golden v Metropolitan Tr. Auth., supra,* at 132), we refused to read the foregoing cases as authority for the proposition that "any actions taken pursuant to an invalid agency determination must be 'undone' " *(supra,* at 132, or that the remedy for an apparent SEQRA violation is to restore conditions to the way they existed before the agency action was taken. The matter at bar does not involve a determination requiring that conditions be restored to the status quo ante. To the contrary, the Planning Board, in the instant case merely ordered the petitioner to implement certain modifications so as to minimize the adverse environmental impacts of the construction project. It is also significant, for purposes of distinguishing the two cases, that *Golden* did not involve any determination that the action undertaken would be detrimental to the environment, as is the situation in the case under review. Finally, the issue confronted in *Golden* was whether the issuance of injunctive relief was proper. In the present case, the issue before us is simply whether the agency's determination was arbitrary and capricious. Therefore, that determination should not be disturbed by a court of law. The allegedly less onerous alternative means available by which adverse environmental impacts allegedly could be mitigated were fully considered by the Planning Board and rejected by it.

▮ Finally, we find that Special Term did not err in refusing to compel the building inspector to issue permanent certificates of occupancy. Although this court previously vacated an injunction prohibiting the issuance of certificates pursuant to the four-month Statute of Limitations, our prior order did not affirmatively direct the issuance of these certificates. Moreover, in light of the fact that the Board's determination has been confirmed, and the building inspector must further ascertain whether the petitioner has complied with applicable laws and ordinances, it would be premature and improper to order the issuance of certificates at this juncture.

Accordingly, the judgments appealed from should be affirmed.

RUBIN, J. (dissenting).

## I FACTS

In August 1982, the petitioner E.F.S. Ventures Corp. (hereinafter EFS) purchased a 5.2-acre parcel on the north side of Old Montauk Highway, which had been improved by a dwelling, small motel and cottages, known as the Beachcomber. Thereafter, EFS applied for approval of a site plan for the renovation of the existing 12-unit motel building, the relocation and conversion of the existing dwelling into two units (hereinafter Hill House), construction of a 20-unit motel building (hereinafter Ocean West), construction of a 30-unit motel building (hereinafter Ocean East), construction of an office, the removal of a metal storage building and the retention of six cottages, housing 11 motel units. The entire Beachcomber development would contain 75 motel units. By resolution, dated September 29, 1982, the Planning Board of the Town of East Hampton (hereinafter the planning board) approved the site plan, subject to compliance by EFS with specified conditions recommended by the planning board's planning and design consultant. Some of the conditions imposed by the planning board were designed to mitigate the environmental impact of the project upon a small pond located at the northeast corner of the parcel, reported to be the breeding ground for an endangered species—the blue-spotted salamander. For example, the board required the relocated Hill House to be set back a minimum of 75 feet from the pond's edge, the septic and leaching fields to be set back a minimum of 100 feet, and the granting of a 50-foot scenic easement surrounding the pond to the Town of East Hampton. The planning board also required that a berm be reconstructed to contain drainage from the parking lot. In recommending approval of the site plan, the planning board's retained consultant noted that the location of the motel structures, parking lots and driveway seemed to conform better with the existing topography than the originally approved site plan submitted by the previous owners. In November, building permits were issued and construction commenced in accordance with the planning board's conditions. Minor amendments to the site plan were thereafter approved by resolution of the planning board on December 1, 1982.

On January 26, 1983, EFS submitted to the planning board for approval a modified site plan, which provided for the removal of all the cottages and the construction of a 28-unit structure (hereinafter Oceanside), a swimming pool and tennis court. The modified site plan provided for a net increase of 17 motel units. Some of the cottages to be demolished were nonconforming, due to their proximity to Old Montauk Highway. The planning consultant retained by the planning board reviewed this proposal and advised the planning board, *inter alia*, that the project was an "unlisted action", pursuant to the State Environmental Quality Review Act (SEQRA; ECL art 8) and that the project would not result in an adverse impact on the environment. By letter dated February 18, 1983, the planning board informed EFS that it had made a determination of nonsignificance. Subsequently, EFS prepared part one of the environmental assessment form (hereinafter EAF), and the planning board's planning consultant prepared part two. On March 16, 1983, the planning board prepared part three of the EAF and concluded that, after a review of parts one and two, the modified site plan would result in "a potential overall small to moderate impact on the environment", which could be mitigated by the measures outlined in part two of the EAF. On March 17, 1983, the planning board filed with the Town Clerk a formal "negative declaration" under SEQRA and issued a resolution, approving the modified site plan, subject to specified conditions. On March 31, 1983, building permits were issued, and construction commenced.

On or about April 14, 1983, local residents commenced a proceeding pursuant to CPLR article 78 to set aside the planning board's March 17, 1983 resolution approving the modified site plan on the ground, *inter alia*, that the planning board had not literally complied with the statutory mandates of SEQRA when it made its initial finding of environmental nonsignificance prior to the preparation of the environmental assessment forms. On April 15, 1983, an order temporarily restraining further construction pending the hearing of a motion for a preliminary injunction was granted. EFS halted construction in compliance with the temporary restraining order. As of that date, 90% of the development to be constructed pursuant to the planning board's approval of EFS's original site plan was complete at a cost of $1,313,000. In accordance with the modified site plan, EFS had demolished the six cottages, had excavated the site for the 28-unit Oceanside structure, laid the footings and foundation for this build-

ing and had framed a portion of the first story, at a cost in excess of $136,000.

By order, dated April 20, 1983, the temporary restraining order was vacated and the local residents' motion for an order preliminarily enjoining construction during the pendency of their proceeding pursuant to CPLR article 78 was denied due to the unlikelihood of success on the merits. EFS recommenced construction in accordance with the planning board's prior resolutions. It is noteworthy that the local residents did not seek leave to appeal from the denial of their motion for a preliminary injunction nor did they apply to this court pursuant to CPLR 5518 for an order restraining construction pending an appeal from the order dated April 20, 1983. Consequently, by the time Special Term rendered its disposition of the local residents' proceeding, the portion of the development constructed pursuant to the modified site plan was complete at a cost of $700,000. Needless to say, the remaining 10% of the construction on the project built pursuant to the original site plan was also complete.

By order, dated October 12, 1983, Special Term granted the local residents' petition to the extent of setting aside the planning board's March 17, 1983 resolution, which approved the modified site plan, and remitting the matter for a de novo determination, after full compliance with the statutory mandates of SEQRA. Special Term also enjoined the issuance of certificates of occupancy for the 64 units constructed or renovated pursuant to the planning board's September 1982 resolution approving EFS's original site plan. EFS appealed this order.

By order dated April 15, 1985, this court, in disposing of EFS's appeal, affirmed so much of Special Term's order of October 12, 1983, as granted the local residents' petition to the extent of setting aside the planning board's resolution filed March 17, 1983, which approved the modified site plan, and remitting the matter to the planning board for reconsideration, after literal compliance with the mandates of SEQRA. However, this court expressly noted that "the four-month Statute of Limitations precludes the granting of *relief* concerning construction commenced and/or completed pursuant to the [Board's] September 1982 and prior resolutions [the resolutions that approved the original site plan] *(see,* CPLR 217)" *(Matter of Nielsen v Planning Bd.,* 110 AD2d 767, 769; emphasis added). Consequently, this court vacated the injunction prohibiting the issuance of certificates of occupancy for the 64

motel units located in Ocean East, Ocean West, and Hill House *(Matter of Nielsen v Planning Bd., supra)*.

While EFS's appeal from Special Term's October 12, 1983 order was pending, the planning board, in compliance with Special Term's order, reconsidered, de novo, the modified site plan. After environmental assessment forms were prepared, the planning board issued a positive declaration under SEQRA. Subsequently, draft and final environmental impact statements were prepared. The requisite public hearing and comment periods were also conducted, in literal compliance with the procedural requirements of SEQRA.

The planning board identified eight major and two minor safety and environmental concerns. One major adverse impact identified by the planning board pertained to the limited sight distance available at the access driveway for the Beachcomber development. The access driveway is located on Old Montauk Highway, which runs along the entire southern border of the premises. A crest in the highway in the vicinity of the parcel's eastern property line limits the sight distance of vehicles approaching the access driveway on the highway from the east to approximately 250 feet. According to the National Cooperative Highway Research Program, the recommended minimum sight distance for a road with a posted 30-mile-per-hour speed limit, such as Old Montauk Highway, is 430 feet. Another major adverse impact pertained to an interior roadway traffic circulation problem for emergency vehicles, i.e., an inadequate radius for the turnaround of fire apparatus servicing Ocean East, Hill House and Ocean West, which are connected by a roadway, with adjacent parking facilities, that terminates in a dead end at the western corner of Ocean West.

By resolution, dated September 5, 1984, the planning board approved the modified site plan subject to EFS's compliance with several measures to mitigate all the significant environmental concerns identified by the planning board in the final environmental impact statement. The most financially costly mitigation measure imposed by the planning board required the removal of 10 motel units and the relocation of the access driveway. The planning board directed the removal of Hill House (housing two motel units) to provide an area for emergency vehicles and fire apparatus to turn around and to provide an additional buffer area for the pond. Four units on the eastern corner of Ocean East were to be removed in order to reroute the interior roadway to provide a safer curve radius

for fire apparatus and to provide a buffer area between the development and adjoining property to the east of the premises. Additionally, EFS was to close the current access driveway and to remove the four units on the west corner of the Oceanside structure in order to relocate the access driveway west of its current location, which would furnish a sight-stop distance of over 400 feet. EFS proposed alternate measures to effectively mitigate the access driveway sight distance concern and the emergency vehicle circulation concern, which included the regrading of 100 feet of Old Montauk Highway at EFS's expense to provide safe access visibility and the opening of a portion of School Lane, a mapped road located on the western border of the premises, to provide an area for emergency vehicles to turn around. The Town Engineer stated that the regrading of Old Montauk Highway to improve sight distance at the current access driveway location was the most desirable alternative from an engineering standpoint and that proposal had the authorization of the Highway Superintendent of the Town of East Hampton. The Chairman of the Board of Fire Commissioners of the Montauk Fire District stated that upon reviewing EFS's modified site plan, the Board of Fire Commissioners was of the opinion that the current interior roadway provided an adequate curve radius and turnaround area for fire engines. Rather than removing Hill House, the Board of Fire Commissioners found acceptable EFS's proposal to open a portion of School Lane for the purpose of making a cul-de-sac for fire apparatus to turn around. A member of the Montauk Fire Department, familiar with the site, and the Chief of the Fire Department concurred with this opinion. Even the Chief Fire Inspector of the Town of East Hampton's Department of Fire Prevention, who characterized the interior emergency vehicle circulation flow to the rear of Ocean East, Hill House and Ocean West as a "firefighter's nightmare", acknowledged that opening a section of School Lane would be an acceptable mitigation measure. The alternative mitigation measures proposed by EFS were rejected by the planning board, which concluded that the wildlife corridor within School Lane should not be disturbed and that on-site, rather than off-site, mitigation measures were preferable.

Thereafter, EFS commenced the instant CPLR article 78 proceeding to set aside the planning board's resolution of September 5, 1984, approving the modified site plan, conditioned, *inter alia,* upon the destruction of 10 motel units. In a

memorandum decision, dated January 23, 1985, Special Term (Stark, J.), concluded that the planning board, in reviewing the modified site plan for the 28-unit Oceanside building, properly considered the environmental impact of the entire development, rather than confining their review to the proposed enlargement, and that the planning board had arrived at an acceptable balance between conflicting interests. Additionally, Special Term held that EFS had acquired no vested rights, upon finding that it had completed the project at its peril by "proceeding full tilt" with construction during the prior proceeding pursuant to CPLR article 78, which resulted in a judgment annulling the planning board's March 17, 1983 resolution approving the modified site plan. In the judgment appealed from, entered March 20, 1985, Special Term dismissed the proceeding.

On May 15, 1985, EFS commenced a second proceeding pursuant to CPLR article 78 to compel the building inspector to issue permanent certificates of occupancy for the 64 units located in Ocean East, Ocean West and Hill House, erected pursuant to the original site plan. The building inspector would only issue temporary certificates of occupancy for 58 of the 64 units, because the remaining six units were among the 10 units required to be destroyed, pursuant to the planning board's September 5, 1984 resolution. Furthermore, the building inspector advised EFS that no permanent certificates would issue until EFS had complied with all the conditions imposed by the resolution dated September 5, 1984. By judgment, dated July 29, 1985, Special Term (Stark, J.), dismissed the proceeding upon finding no legal basis for granting mandamus compelling the building inspector to issue 64 permanent certificates of occupancy.

## II THE DOCTRINE OF EQUITABLE ESTOPPEL

I disagree with my learned colleagues regarding the issue of whether or not the doctrine of equitable estoppel may be invoked under the extraordinary circumstances at bar to preclude the planning board from imposing as a condition to approval of the modified site plan the removal of 10 motel units.

It is well settled that a governmental agency may be estopped where its wrongful or negligent conduct induces a party relying thereon to change his position to his detriment *(Bender v New York City Health & Hosps. Corp.,* 38 NY2d 662,

668; *Landmark Colony v Board of Supervisors,* 113 AD2d 741, 744). Although estoppel should be invoked "only in truly exceptional cases, involving, as it often does, an intrusion, *pro tanto,* by the judiciary, into the prerogatives of other branches of the government" *(Eden v Board of Trustees of State Univ.,* 49 AD2d 277, 284; *Luka v New York City Tr. Auth.,* 100 AD2d 323, 325, *affd* 63 NY2d 667; *Landmark Colony v Board of Supervisors, supra),* courts have not hesitated to invoke estoppel if a manifest injustice would otherwise occur *(see, Scruggs-Leftwich v Rivercross Tenants' Corp.,* 119 AD2d 88; *Bender v New York City Health & Hosps. Corp., supra,* at 668; *Landmark Colony v Board of Supervisors, supra; Matter of 1555 Boston Rd. Corp. v Finance Adm'r of City of N. Y.,* 61 AD2d 187, 192; *Eden v Board of Trustees of State Univ., supra,* at 284).

Furthermore, there is authority for invoking equitable doctrines to prevent manifest injustice in suits brought to compel compliance with Federal and sister States' environmental protection statutes that are analogous to SEQRA. For example, in *People v Department of Hous. & Community Dev.* (45 Cal App 3d 185, 119 Cal Rptr 266), a State agency had issued a permit for the construction of a mobile home park without preparing an environmental impact statement, in violation of the California Environmental Quality Act (hereinafter CEQA) *(see,* Cal Public Resources Code § 21000 *et seq.).* The applicant had waited four months to ascertain whether the State would require environmental inquiries under CEQA, and, after receiving official assurances that these inquiries were unnecessary, he forwarded his application to the State and received the construction permit. Upon receiving the permit, the applicant removed and destroyed improvements worth about $20,000 and spent about $20,000 for construction, administrative outlays and lease payments. Thereafter, the State's representative filed suit to rescind the permit for noncompliance with CEQA. While recognizing that in environmental suits equitable defenses will rarely be invoked to defeat a policy adopted for the public protection, the California Court of Appeals held that the State was barred by laches, a doctrine which rests on the same principle as estoppel, from annulling the developer's permit where nullification would cause injustice of sufficient dimension to warrant judicial refusal to enforce environmental procedures which should have preceded his project. The court concluded that $40,000 represented an undebatable quantum of prejudice and rejected the State's argument that

the bar of laches would allow developers to rush into actual construction immediately after approval of construction permits and thereby defeat anticipated lawsuits to enforce statutory procedures to protect the environment. The court noted that this argument overlooks judicial refusal to tolerate such tactics and, absent evidence of bad faith, the developer had every right to rely upon the official permit sanctioning his proposal. Since the record showed no acceleration of the developer's activities for the purpose of "beating out" the opposition, the court sustained the developer's defense of laches.

Similarly, in cases involving violations of the National Environmental Policy Act (hereinafter NEPA) *(see,* 42 USC § 4321 *et seq.),* the statute upon which SEQRA was modeled *(Aldrich v Pattison,* 107 AD2d 258; *H.O.M.E.S. v New York State Urban Dev. Corp.,* 69 AD2d 222, 232), Federal courts have also invoked the doctrine of laches and have refused to preliminarily enjoin construction where the petitioner's delay in bringing a proceeding to compel compliance with NEPA had resulted in construction proceeding to a "point where any significant environmental damage [had] already been done" or, in the alternative, where "construction may have gone so far that for economic reasons it would be impracticable or impossible to alter much of the basic plan" *(Steubing v Brinegar,* 511 F2d 489, 495; *see, e.g., City of Rochester v United States Postal Serv.,* 541 F2d 967; *Dalsis v Hills,* 424 F Supp 784; *Riverdale Envtl. Action Comm. Along Hudson v Metropolitan Transp. Auth.,* 638 F Supp 99, 102-103, *affd* 797 F2d 110). This court has also taken cognizance of the fact that when environmental impact statements are not prepared at an early stage, modification of a project in light of subsequently discovered environmental problems may no longer be feasible "because nonenvironmental considerations may have already been transformed into an over-all proposal" *(Matter of Sun Beach Real Estate Dev. Corp. v Anderson,* 98 AD2d 367, 371, *affd* 62 NY2d 965; *Golden v Metropolitan Transp. Auth.,* 126 AD2d 128).

(A) APPLICATION OF EQUITABLE ESTOPPEL
TO BAR DESTRUCTION OF SIX UNITS
CONSTRUCTED IN ACCORDANCE WITH
THE PLANNING BOARD'S RESOLUTION OF
SEPTEMBER 29, 1982

In the instant case, 6 of the 10 units (two units in Hill

House and four units in Ocean West), directed by the planning board to be demolished to mitigate the traffic circulation concern for emergency vehicles using the interior roadway for Ocean East. Hill House and Ocean West, were renovated and/or constructed pursuant to the planning board's September 29, 1982 resolution, approving EFS's original site plan application. Furthermore, the dead end, interior subject roadway and adjacent parking facilities were also approved pursuant to this resolution. Contrary to the majority's representation, neither Special Term nor this court annulled the planning board's September 29, 1982 resolution, as the local residents had never timely commenced a proceeding to set aside this resolution predicated upon the failure of the planning board, as lead agency, to literally comply with the procedural requirements of SEQRA (see, Matter of Nielsen v Planning Bd., 110 AD2d 767, supra). Moreover, such relief would clearly have been barred by the defense of laches, since 90% of the project constructed pursuant to the approved original site plan had been completed at a cost of approximately $1,313,000 as of the date the local residents commenced their proceeding to review the planning board's resolution, filed March 17, 1983. Similar to the applicant in People v Department of Hous. & Community Dev. (45 Cal App 3d 185, 119 Cal Rptr 266, supra), EFS acted in good faith in relying upon the September 1982 resolution of the planning board approving their original site plan, as no timely challenge had been made and EFS fully complied with the measures recommended by the planning board's consultant to mitigate adverse impacts upon the environment, in particular, the pond. There is no evidence that EFS rushed to complete construction in accordance with the approved original site plan. The financial detriment to EFS if required to remove these six units includes the renovation and relocation costs for Hill House ($46,875), the initial construction costs for four units of the Ocean East building (approximately 13% of the cost for Ocean East or about $100,000), demolition costs, reconstruction of foundation and refurbishing costs for the adjacent units in Ocean East ($300,000), and lost rental revenue (approximately $100 per day, per unit). If required to remove the subject six units, the financial detriment to EFS resulting from the applicant's good-faith reliance upon the planning board's September 1982 resolution is an undebatable quantum of prejudice.

Lastly, a viable alternative for mitigating the emergency

vehicle circulation concern was proposed by EFS and approved by fire officials. A relatively small segment of School Lane could be opened in a half circle to provide a turnaround for emergency vehicles. Alternatively, aerial photos show that a segment of School Lane, which is already open, could be extended 50 to 100 feet to the northwest parking lot, behind Ocean West. By designating School Lane a one-way fire lane and by enforcing such designation, wildlife, after the initial excavation and paving, would only be disturbed in the event of an emergency. Since the pond is situated in the northeast corner of the parcel and School Lane runs along the western boarder, the substantive comment of a member of the planning board that the opening of School Lane would not seem to pose a threat to the pond has a rational basis.

It is noteworthy that if EFS had never submitted an application to modify the original site plan to include a 28-unit structure (Oceanside) to be located on the southern border of the premises, and a tennis court and swimming pool to be located in the center of the development, the requirement in the planning board's September 5 1984 resolution, that the six units at issue be removed as a condition for approval of the modified site plan could never have been lawfully imposed, as this court expressly noted on the prior appeal that the "four-month Statute of Limitations precludes the granting of relief concerning construction commenced and/or completed pursuant to the September 1982 and prior resolutions" *(Matter of Nielsen v Planning Bd., supra,* at 769).

Based on the aforenoted facts, the mitigation measure imposed by the planning board's September 5, 1984 resolution, which requires the demolition of six units constructed in accordance with the unchallenged September 29, 1982 resolution, when other adequate, albeit less preferable, alternatives are available to effectively mitigate an adverse environment impact identified *after* the completion of the project, would result in manifest injustice to EFS *(see, People v Department of Hous. & Community Dev., supra).* It bears repeating that EFS, in good faith, relied to its financial detriment on the untimely challenged original site plan approval of the planning board when it fully complied with the conditions initially required by the agency's own environmental consultant to mitigate adverse environmental consequences of the project. Under these exceptional circumstances, I conclude that the planning board should be estopped from imposing as a condition to approval of EFS's modified site plan, the removal of

Hill House and the four units on the eastern corner of Ocean East.

(B) APPLICATION OF EQUITABLE ESTOPPEL
TO BAR DESTRUCTION OF FOUR MOTEL UNITS
CONSTRUCTED IN ACCORDANCE WITH THE
PLANNING BOARD'S RESOLUTION FILED
MARCH 17, 1983

In my opinion, the planning board should also be estopped from requiring EFS to comply with so much of its September 5, 1984 resolution as directs the razing of the four units on the western corner of the Oceanside structure for the purpose of relocating the access driveway to this area of the development, in order to mitigate the limited sight distance concern at the present location of the access driveway on Old Montauk Highway. These four units were constructed in accordance with the planning board's resolution filed March 17, 1983, approving EFS's *modified* site plan, which was subsequently set aside for noncompliance with SEQRA in the proceeding commenced by local residents. Unlike the six units in Hill House and Ocean East which had been constructed in accordance with the untimely challenged September 29, 1982 resolution, neither the Statute of Limitations nor laches, which requires a showing of unreasonable delay, was available as a defense. However, these factors do not preclude the application of the doctrine of equitable estoppel. At the time that proceeding had been commenced, EFS had already detrimentally changed its position and incurred substantial expenses in good-faith reliance upon the planning board's March 1983 resolution as evidenced by the fact EFS had already implemented 25% of the modified site plan. EFS had incurred about $4,000 in cost to demolish the six cottages, having an estimated value of $325,000, had excavated the site of the Oceanside structure at a cost of $6,000, had laid the footings and foundation of the Oceanside structure at a cost of $10,000, and had precut lumber and partially framed the first story at a cost of $23,000. In addition to expenses associated with this work, EFS had also incurred contractual obligations associated with building and furnishing the Oceanside structure, by the scheduled opening date—May 30, 1983. Between March 31, 1983 and April 15, 1983, a total of approximately $136,000 had been expended on the implementation of the modified site plan.

The fact EFS completed the project, at a cost of $700,000,

pending a determination of the proceeding brought by the local residents, does not, under the circumstances of this case, vitiate EFS's good-faith reliance upon the planning board's March 17, 1983 resolution. Prior to having received approval in March 1983 of the modified site plan application, it was the planning board's retained consulting firm, not an agent of EFS, that had conducted an environmental assessment study. The consulting firm had adhered to its previous recommendation to the planning board that EFS's proposed modification of the original site plan was an unlisted action under SEQRA and that the proposed project would not result in an adverse impact on the environment. The planning board formally issued a negative declaration, after reviewing the environmental assessment forms. Subsequently, Special Term vacated a temporary restraining order and denied the local residents' motion for a preliminary injunction against further construction pending their proceeding to set aside the planning board's approval of EFS's modified site plan, based upon a finding that there was not a likelihood of success on the merits. When confronted with these administrative and judicial rulings, it cannot be said that EFS acted in bad faith in proceeding with construction during the pendency of the CPLR article 78 proceeding commenced by the local residents.

Nor can I concur with the majority's finding that EFS proceeded at its own risk in completing the project, after vacatur of a temporary restraining order and denial of the local residents' motion for a preliminary injunction. Courts have held that injunctive relief will not issue to prohibit a *fait accompli* (see, *Town of Oyster Bay v New York Tel. Co.*, 75 AD2d 598; *Finger Lakes Health Sys. Agency v St. Joseph's Hosp.*, 81 AD2d 403, *lv denied* 55 NY2d 606), even in the context of a violation of environmental protection statutes (see, *Golden v Metropolitan Transp. Auth.*, 126 AD2d 128, *supra; City of Rochester v United States Postal Serv.*, 541 F2d 967, *supra; Florida Wildlife Fedn. v Goldschmidt*, 611 F2d 547). This rule is particularly appropriate, where the proponent was slow to invoke the process of the court to preserve the status quo, during which period a project was completed at considerable cost to the builder (see, *University Gardens Prop. Owners Assn. v Schultz*, 272 App Div 949, *rearg denied* 272 App Div 977; *Forstmann v Joray Holding Co.*, 244 NY 22; *see also, Florida Wildlife Fedn. v Goldschmidt, supra; Golden v Metropolitan Transp. Auth., supra; City of Rochester v United States Postal Serv.*, 541 F2d 967, *supra*).

The local residents had an obligation to invoke the aid of the courts to restrain construction and preserve the status quo pending their proceeding to set aside the planning board's March 17, 1983 resolution *(Goldfarb v Freedman,* 76 AD2d 565). While an initial unsuccessful effort was made, the local residents did not seek leave to appeal from the denial of their motion for a preliminary injunction, nor a stay pending appeal, pursuant to CPLR 5518, to preserve the status quo *(see, Governale v Porsche-Audi of Bay Ridge,* 97 AD2d 457; *Florida Wildlife Fedn. v Goldschmidt, supra; cf., Lieferant v Bartell,* 36 Misc 2d 477). Under these circumstances, EFS did not complete construction at its own peril, so as to preclude application of the doctrine of equitable estoppel.

As in the case of the six units in Hill House and Ocean East, the financial detriment to EFS if required at this stage to remove the four units on the western corner of Oceanside and to relocate the access driveway will be unduly harsh, consisting of the initial costs for constructing the four units of Oceanside (⅐ of the entire structure), demolition expenses, costs for rebuilding the foundation and refurbishing the adjacent units of Oceanside, the loss of rental income, and the costs for relocating the access driveway. It would be a manifest injustice to require EFS to sustain such a loss, resulting from its good-faith reliance upon the planning board's March 1983 resolution, where an alternative measure is available to effectively mitigate the limited sight distance problem at the access driveway where it is presently located by simply requiring EFS to remove a crest in Old Montauk Highway, a measure approved by the Town Engineer and the Highway Superintendent. The inconvenience to travelers, during the regrading of a stretch of 100 feet of Old Montauk Highway, at EFS's expense, is nominal in face of the manifest injustice EFS will incur if required to demolish the subject four units and to relocate the access driveway. Under these unique circumstances, application of the doctrine of estoppel is warranted.

## III RELIEF

Invoking the doctrine of equitable estoppel to preclude the planning board from conditioning its September 5, 1984 approval of the *modified* site plan upon the removal of 10 motel units does not render meaningless this court's previous affirmance of so much of Special Term's judgment of October 12,

1983, as set aside the planning board's March 17, 1983 resolution and remitted the matter to the agency for reconsideration of EFS's modified site application after literal compliance with SEQRA. I agree with the majority that in reviewing de novo the modified site plan, the planning board was required under SEQRA to assess the environmental impact of the project as a whole and not just the impact of the 28-unit Oceanside structure in isolation *(Matter of Town of Henrietta v Department of Envtl. Conservation,* 76 AD2d 215). To permit noncomprehensive consideration of a project divisible into smaller parts, each of which taken alone does not have a significant impact but which taken as a whole has cumulative significant impact, would provide a clear loophole in SEQRA *(cf., City of Rochester v United States Postal Serv.,* 541 F2d 967, 972, *supra; Plan for Arcadia v Arcadia City Council,* 42 Cal App 3d 712, 117 Cal Rptr 96). Concededly, a fire out of control due to insufficient access and turnaround areas for fire apparatus in the area of the project developed, pursuant to the original site plan, would impact upon the 28-unit Oceanside structure built pursuant to the modified site plan, as well as neighboring properties. Similarly, the traffic generated by the Oceanside structure, when combined with the traffic generated by the retention of 64 units constructed pursuant to the original site plan pose a potential traffic safety hazard at the presently located access drive. If the modified site plan had still been in the planning stage, the planning board, after having identified the aforenoted adverse environmental impacts, would be acting within the scope of its authority to condition approval of the modified site plan upon compliance with the best practicable measures for avoiding or minimizing such impacts to the maximum degree possible *(see,* ECL 8-0109 [8]; 6 NYCRR 617.9 [c]). Prior to construction, EFS would not be prejudiced by the imposition of such mitigating measures, since it would still have the option to undertake the modified site plan project or to forgo it and retain the development constructed pursuant to the original site plan. Recall that the modified site plan, as proposed by EFS, provided for the demolition of six cottages, housing 11 motel units, in exchange for the construction of a 28-unit Oceanside structure, for a net increase of 17 units. However, the conditions now imposed by the planning board would require not only the destruction of the six cottages, but also the demolition of four newly constructed units in Ocean East, the destruction of the renovated and relocated Hill House, and the costly relocation of the access and internal

driveway in exchange for the construction of a 24, rather than a 28, unit structure, for a net increase of seven motel units, a pool and tennis court. It is dubious that a developer would have undertaken the project in the first instance, had the planning board initially conditioned approval of the modified site plan upon compliance with the mitigating measures ultimately imposed in its September 5, 1984 resolution. However, by the time the local residents had commenced their proceeding to compel literal compliance with SEQRA, EFS was financially committed to the proposal, having already completed approximately 25% of the modified site plan project. By the time Special Term rendered its order, remitting the matter to the planning board, the entire project was complete. The inequity in so much of the planning board's September 5, 1984 resolution as conditions approval upon the destruction of 10 motel units results from the fact that construction had already proceeded to a point where, for economic reasons, it would not be feasible to alter much of the basic, modified site plan in light of subsequently discovered environmental concerns.

In considering the proper remedy once a violation of SEQRA has been shown, this court recently took cognizance of the distinction between cases where the project is still in the planning stage, as opposed to being implemented or fully completed *(see, Golden v Metropolitan Transp. Auth., supra)*. While a determination made in violation of SEQRA is rendered a nullity *(Chinese Staff & Workers Assn. v City of New York*, 68 NY2d 359; *Matter of Tri-County Taxpayer Assn. v Town Bd.*, 55 NY2d 41), these cases should not be construed as meaning that any project completed in good faith pursuant to an invalid agency determination must be "undone", or that, as a matter of law, there must be a return to the "status quo ante" *(Golden v Metropolitan Transp. Auth., supra,* at 132).

In *City of Rochester v United States Postal Serv. (supra),* the relief fashioned by the Second Circuit to remedy a violation of NEPA after construction had proceeded to a point where for economic reasons it would not be feasible to alter much of the basic plan, is instructive with respect to fulfilling the statutory mandate of SEQRA under analogous circumstances. In that case, the United States Postal Service had decided to relocate a post-office terminal from downtown Rochester to suburban Henrietta. No environmental impact statement had been prepared in violation of NEPA. When construction of the new facility was 18% completed, the petitioners commenced

an action to enjoin construction and to compel compliance with NEPA. Applying the doctrine of laches, the court concluded that the petitioners were barred from enjoining the construction of the new Henrietta facility, upon finding that during the delay in bringing suit construction had proceeded to a point where it was impractical for economic reasons to enjoin further development and that further construction would not create such an adverse environmental impact, beyond that already incurred by partial construction, as to override the public interest in averting the economic waste entailed from midstream termination of the construction contracts. Nevertheless, the court directed the preparation of an environmental impact statement, as if the construction decision (and activity) had not yet taken place. However, the location of the construction site was to be deemed fixed. The court believed that the preparation of an environmental impact statement from such a perspective would identify adverse environmental impacts and would not unnecessarily stifle creative consideration of methods for minimizing environmental damage at the construction site. Cognizant that it was unlikely that construction planned without the benefit of an environmental impact statement would achieve the *best practicable* measures for minimizing adverse environmental impacts at the construction site and that such measures might be foreclosed by the bar against relocating the site, the court opined that some useful alternatives might still be available.

Similarly, in this case, upon this court's remittitur of the modified site plan to the planning board for reconsideration, after literal compliance with SEQRA, numerous significant environmental concerns have been identified and the creative consideration of alternative mitigating measures has not been stifled. In order to avoid manifest injustice to EFS, estopping the planning board from mitigating the access driveway limited sight distance problem and the emergency vehicle circulation problem by the method of demolishing 10 motel units will not foreclose the implementation of alternative measures that will effectively mitigate these adverse impacts, albeit those measures are not the "best" in the assessment of the lead agency—the planning board. Nevertheless, a benefit has been achieved by the planning board's reconsideration of the modified site plan application after literal compliance with the statutory mandates of SEQRA. The application of the doctrine of equitable estoppel to prevent manifest injustice in this exceptional case does not vitiate this court's prior holding in

*Matter of Nielsen v Planning Bd.* (110 AD2d 767, *supra),* nor does it signal a departure from the rule of literal compliance with the environmental review procedures set forth in SEQRA and the regulations *(see, Aldrich v Pattison,* 107 AD2d 258, *supra; Glen Head—Glenwood Landing Civic Council v Town of Oyster Bay,* 88 AD2d 484, 490-491; *Matter of Rye Town/ King Civic Assn. v Town of Rye,* 82 AD2d 474, *appeals dismissed* 55 NY2d 747, *lv dismissed* 56 NY2d 985, *rearg denied* 57 NY2d 775).

Accordingly, in proceeding No. 1, I vote (1) to reverse the judgment, entered March 20, 1985; (2) to grant EFS's petition to the extent of annulling so much of the planning board's determination as imposed, as a condition for approval of the *modified* site plan, the demolition of two units in Hill House, the four units in the eastern corner of Ocean East, and the four units in the western corner of Ocean West; and (3) to remit the matter to the planning board to consider and implement alternative measures for mitigating the limited site access driveway concern and the emergency vehicle circulation concern, with the proviso that the planning board is directed to refrain from ordering the demolition of any other units. Since nonenvironmental considerations have already been incorporated into EFS's completed *original* and *modified* site plan proposals, the planning board should be directed to choose the next best practicable alternatives which, consistent with social, economic and other essential considerations, will avoid or minimize to the maximum degree possible the afore-noted adverse impacts.

In proceeding No. 2, with respect to the judgment dated July 29, 1985, dismissing EFS's petition to compel the building inspector to issue permanent certificates of occupancy for 64 units constructed pursuant to the original site plan approved by the planning board's September 29, 1982 resolution, I would reverse this judgment and grant EFS's petition to the extent of directing the building inspector to issue 64 temporary certificates of occupancy. It is clear from the record that six temporary certificates of occupancy were withheld by the building inspector for the sole reason that the planning board's September 5, 1984 resolution, approving the modified site plan, required the removal of the two motel units in Hill House and the four eastern motel units in Ocean East. Since I conclude that the planning board is estopped from imposing as a condition for approval of the modified site plan the removal of these six units, there is no reason remaining for withhold-

ing temporary certificates of occupancy for those units. EFS will be entitled to permanent certificates of occupancy for 92 motel units, "[w]hen, after final inspection [by the building inspector], it is found that the [Beachcomber development] has been completed in accordance with the applicable building laws, ordinances and regulations; and also in accordance with the application, plans and specifications filed in connection with the issuance of the building permit[s]" *(see,* Code of Town of East Hampton § 53-15; *see also,* § 153-10-40). The latter would include compliance with the planning board's resolution of September 5, 1984 (except for the conditions requiring the removal of the subject 10 units) and any alternative measures the planning board may impose for mitigating the limited sight access driveway concern and the emergency vehicle circulation concern.

LAWRENCE, J. P., EIBER and SPATT, JJ., concur; RUBIN, J., dissents and votes to reverse the judgments entered March 20, 1985, and dated July 29, 1985, respectively, and to grant the petitions of E.F.S. Ventures Corp. to the extent of annulling so much of the planning board's determination as imposed, as a condition for the approval of the petitioner's modified site plan, the removal of 10 motel units and the relocation of the access driveway to the development, remitting the matter to the planning board for reconsideration and implementation of an alternative measure not involving the removal of any motel units for mitigating the environmental impacts pertaining to interior traffic circulation for emergency vehicles and sight distance at the access driveway, and compelling the building inspector to issue 64 temporary certificates of occupancy, with an opinion.

Ordered that the judgments are affirmed, without costs or disbursements.